**Edgar C. FRYLING and Onie Fryling, Plaintiffs-Appellants,**

v.

**MERRILL LYNCH, PIERCE, FENNER & SMITH INC. and William Roebuck, Defendants-Appellees.**

No. 77–3088.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 10, 1978.

Decided Feb. 27, 1979.

---

Frederick F. Stannard, Scottsdale, Ariz., for plaintiffs-appellants.

David J. Young, Dunbar, Kienzle & Murphey, Columbus, Ohio, for defendants-appellees.

Before LIVELY and ENGEL, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

HARRY PHILLIPS, Senior Circuit Judge.

This appeal involves an effort to invoke federal securities laws to protect an investor from his own unorthodox and high-risk investment philosophy and practices.

Appellants Edgar C. Fryling and Onie Fryling, husband and wife, filed suit against appellees Merrill Lynch, Pierce, Fenner & Smith, Inc. and William Roebuck, an account executive with Merrill Lynch (hereinafter sometimes jointly referred to as Merrill Lynch). The Frylings charged Merrill Lynch and Roebuck with violation of: (1) § 10(b) of the Securities Exchange Act of 1934 (hereinafter the 1934 Act), 15 U.S.C. § 78j(b) and Securities Exchange Commission Rule 10b–5, 17 C.F.R. § 240. 10b–5; (2) § 7 of the 1934 Act, 15 U.S.C. § 78g and Federal Reserve Regulation T, 12 C.F.R. § 220 *et seq.*; (3) Art. III, § 2, of the Rules of Fair Practice of the National Association of Securities Dealers (hereinafter NASD); and (4) Rules 402, 431 and 432 of the Board of Governors of the New York Stock Exchange (hereinafter NYSE). The Frylings further alleged a common law breach of fiduciary duty.

Edgar Fryling (hereinafter Fryling) maintained several accounts with Merrill Lynch. The trading activity in an account bearing the name of Onie Fryling, but under her husband's control, is the subject of this suit. Trading volume in the Onie Fryling account was stipulated between the parties and is detailed in the appendix, *infra.*

The complaint details three specific acts of appellees that Fryling alleges give rise to liability. In count one, Fryling alleges that he was given inaccurate and incomplete information by appellee Roebuck, his account representative, in response to a question from Fryling regarding the margin requirements for "short" trading in securities. In count two, Fryling alleges he was permitted by appellees to continue "short" trading when there was insufficient equity in his margin account to do so. Fryling's count three allegation is that appellees failed to maintain current and accurate information on his account, failed to provide him with up-to-date account information, and failed to issue promptly a margin maintenance call.

At the close of Fryling's case, the defense moved for a directed verdict. District Judge Joseph P. Kinneary granted the motion as to count one of the complaint. Count two, under Fed.R.Civ.P. 15(b), was bifurcated into two causes of action, one alleging violation of Regulation T, and the other alleging violation of Rule 431 of the NYSE, which was appended to count three. Judge Kinneary thereupon directed a verdict with respect to count two. As to count three, the district judge initially denied the motion for a directed verdict.

Thereafter, Merrill Lynch proceeded with its defense. At the conclusion of all the evidence, and at the invitation of Judge

Kinneary, Merrill Lynch renewed its motion for a directed verdict with respect to count three. The district judge granted the motion, holding:

This Court has carefully reconsidered its earlier decision, rendered at the close of the plaintiffs' evidence, denying a directed verdict on count 3 of the complaint. The Court has concluded that its original decision was erroneous. Count 3 does not, as originally determined, state a claim for breach of a fiduciary duty under state law, but rather states a federal claim for breach of Article III, Section 2 of the Rules of Fair Practice of the National Association of Security Dealers and of rule 402, 431 and 432 of the Board of Governors of the New York Stock Exchange.

\* \* \* \* \* \*

WHEREUPON, this Court finds that there is no basis for a claim in count 3 of plaintiffs' complaint. Defendants' motion for a directed verdict is meritorious and is accordingly GRANTED. Since this is dispositive of all of the remaining issues in this lawsuit, judgment is hereby rendered in favor of the defendants.

We affirm.

## I

Fryling is a successful real estate broker residing in Waverly, Ohio. Beginning with a small investment of $3,000 in 1952, Fryling acquired real estate holdings valued in excess of three quarters of a million dollars. Fryling also is an independent securities investor whose investment acumen is largely self-taught. He began playing the market in 1969 with an initial investment of $5,000. At the time of the trial in the present case, he had accumulated a securities portfolio worth between $150,000 and $200,000.

Fryling established a brokerage relationship with Merrill Lynch in 1970, with Roebuck serving as his account executive. Because of Fryling's independent nature, he used Roebuck mainly as an "order taker." Fryling characterized Roebuck's function accordingly:

A. Mr. Roebuck functioned in two capacities primarily. One was to take orders and the other was to supply fundamental, what I call housekeeping information. I did not rely upon Mr. Roebuck for information as to how big of a commitment I should make or what to commit, what securities to work with.

*Mr. Roebuck primarily was an order taker* and delighted in taking orders, so he should not object to having been given a large number. (Emphasis added.)

Fryling neither requested nor relied upon investment advice from Roebuck or Merrill Lynch. Rather, he made his own investment decisions. On cross-examination Fryling testified:

Q. With respect to the selection of stocks and commodities, you were looking to those services rather than Merrill Lynch or Mr. Roebuck; weren't you?
A. I did not look to Mr. Roebuck for selection of stocks.
Q. Neither did you look to Mr. Roebuck for a determination of when you should buy stocks; did you?
A. We had discussions on occasions.
Q. But you didn't seek his advice as to when to start a program; did you?
A. No.
Q. You didn't seek his advice as to how much money you should put in the market; did you?
A. No.

The record reflects that Fryling was unorthodox. Appellee's brief describes him as "a maverick who refused to run with the crowd," pursuing a "bizarre and perhaps 'one-of-a-kind' securities investment program." This investment program involved low-cost, high-risk speculative securities which Fryling felt offered him potential for a high rate of return. In a letter to Roebuck dated July 9, 1970, Fryling set forth his investment philosophy:

So like houses. I am interested in going in deeply into stocks. Thirteen years ago I was buying houses right on in this market—when EVERYONE WAS LEAVING! They all thought that Fry-

ling had gone CRAZY. Now even some of my most critical detractors are buying. And so, with the market DROPPING like a rock, again I am buying! Of course my fingers were burned HARD by getting in too quick and out at the wrong time. This time I hope my nerves and good fortune HOLD UP. (Emphasis original.)

During 1974, Fryling was trading actively on the "long side"[1] of the market. The major portion of his investments were high risk, speculative securities. In late 1974, Fryling suffered severe "paper losses" when the stock market turned downward. By the end of that year, however, the market had reversed itself and Fryling's losses became gains, roughly $60,000 in a period of six months ending April 1975.

Concluding the market was about to turn downward, Fryling decided to liquidate his portfolio, take his profits and embark on a different trading program. Initially he turned to commodities, but soon rejected that field, settling instead on a "short selling"[2] program. In both his "long side" and "short side" trading Fryling operated on margin.[3]

Sometime in April 1975, Fryling telephoned Roebuck to ask him about margin requirements for short trading. While the substance of that conversation is a matter of dispute, Fryling asked a general question regarding the difference in margin rules between short and long trading. Roebuck answered they were the same. Of this telephone conversation, Fryling recalled:

A. The one thing that I was primarily concerned with was there any difference between the long margin program and the short margin program.

Q. As a part of that interest, how did you contact Mr. Roebuck, and when did you contact him?

1. Trading long is the traditional form of securities investment. The investor purchases stock in anticipation of a rise in the market price. The appreciation in market price represents the gross profit made on the investment. *See* testimony of Timothy E. Johnson (hereinafter Johnson), Associate Professor of Finance, University of Cincinnati, Cincinnati, Ohio. Tr. 169–70. [Citations are to the transcript and page therein unless otherwise indicated.]

2. Selling short is the reverse of a normal securities transaction. The investor sells first, in anticipation of a decline in price, and buys back later at a lower price.

An investor borrows securities from or through a brokerage house and then places a sell order. If thereafter the price of the stock declines the investor buys back (covers) at the lower price and then replaces the borrowed stock. The gross profit realized is the difference between the selling price and the cover price. *See* Johnson, Tr. 170–73. *See generally* Senate Comm. on Banking & Currency, Report on Stock Exchange Practices, S.Rep. No. 1445, 73d Cong., 2d Sess. 50–51 (1934).

3. Trading on margin permits an investor to purchase securities while paying only a fractional portion of the total purchase price. [For the margin requirement during the relevant period in question see note 5, *infra*.] The balance is borrowed from a brokerage house, with interest on the amount borrowed.

The generic term "margin" comprehends two somewhat different concepts. As Professor Johnson noted:
A. Margin is the general umbrella of what we are discussing here. The term margin in the brokerage community is used, either correctly or incorrectly, which I feel is not apropos in the community, to talk about the initial and the maintenance.

Now, the initial margin requirement is different than the maintenance margin requirement. The whole topic is the topic of margin, the amount that is required.
Tr. 177.

Initial margin is that amount of the total purchase price of a security which the Board of Governors of the Federal Reserve requires the investor to deposit. Reg. T., 12 C.F.R. § 220. It limits the amount of credit that can be extended by a broker on the purchase of registered securities. *See generally* Comment, *Credit Regulation in the Securities Market: An Analysis of Regulation T,* 62 N.W.L.Rev. 587 (1967).

Maintenance margin is that amount of equity that the investor must maintain in a security (the current market value of the security less any amount owed the broker). It should be noted that the Federal Reserve Board is authorized to regulate both initial margin as well as maintenance margin; the Board has chosen only to regulate the initial extension of credit. 12 C.F.R. § 220.7(b).

Maintenance margin requirements are set by the Board of Governors of the New York Stock Exchange (Rule 431(b)) as well as individual brokerage houses (Merrill Lynch, What Is Margin? 5 (1969)). The NYSE rules establish minimum maintenance requirements. Individual brokerage firms can, and do, require greater maintenance. *See also Analysis of Regulation T,* 62 N.W.L.Rev. 587, 591 n. 35 (1967).

A. He was contacted by telephone. When? It would have been in a period of April 28th or immediately prior to that.

Q. Specifically what question do you recall did you put to Mr. Roebuck?

A. Is there any difference between long margin and short margin?

Q. Did you explain to him at that time why you were asking that question?

A. No, sir, I didn't feel there was need of any explanation. We had sold short at one time before. We were dealing in various phases in the market, and we were at that time still selling long, the long, we were dealing with commodities, and it was an area in which Mr. Roebuck dealt in quite frequently, so asking the question would not have been anything unusual.

Q. What was his reply to that question?

A. No.

Q. Just no?

A. No, there is no difference between the two.

Roebuck's recollection of the telephone conversation differed from that of Fryling:

Q. In my previous question, in the context of it I used what I understand to be Mr. Fryling's question. I ask you now, what was the question, if you can recall, that Mr. Fryling asked you concerning this subject of difference between long and short margin rules? Do you recall what question he asked you?

A. Fairly clearly, yes. He asked me if the margin for selling short was the same as for buying long, and my response was, yes, generally they are the same.

Q. Was your response, "Yes, they are the same," or "Yes, generally they are the same."?

A. Yes, generally they are the same.

Q. You recall that?

A. Yes.

The answer provided by Roebuck was correct insofar as it related to initial margin requirements, but incomplete with respect to maintenance margin requirements.[4] Since Fryling's question was of a general nature, no effort was made in the telephone conversation by either party to distinguish between these two aspects of the rules regulating margin.

On April 28, 1975, Fryling commenced his short selling program. The program continued for nine days thereafter, involving approximately 40,000 shares, in nineteen different companies. (See Appendix.) Contrary to Fryling's downward projections, the market rose sharply. By the time Fryling ceased trading and covered his short positions, he had suffered substantial losses.

4. Initial margin requirements for both short and long trading were identical (50 percent in 1975). Johnson, Tr. 174, 183–85. Maintenance margin requirements could vary with each brokerage house and vary depending on the price of the security. Professor Johnson explained:

Q. Mr. Johnson, I was asking you to apply the maintenance rules as we have just done for long trading to the short transaction and explain to the Court and jury how that works.

A. The general rule is the same until you get down to prices of securities which are very low prices. The rule basically states that if the share price is $5.00 or greater, the maintenance margin requirement is 30 percent of the market value of the security, or $5.00 per share, whichever is greater [Rule 431(b)(3)].

For example, a share at $20, let's use a $20 stock, 30 percent of that, . . . would be $6.00 per share would be what would be required [to meet maintenance requirements].

At $10.00 a share, 30 percent of $10 would be $3.00, and therefore at $10.00 he [the investor] comes under the $5.00 minimum.

. . .

At $11.00 or $10.00 or $8.00, $7.00, $6.00 or $5.00, he is required to put up $5.00 so the percentage of what the maintenance margin is approaches 100 percent as the price is closer and closer to $5.00. . . .

Below $5.00 a share, the maintenance margin requirement is 100 percent of the market value of the stock, or $2.50, whichever is greater . . . [Rule 431(b)(2)].

For example, if the value of the stock is $4.00, he must put up $4.00, 100 percent of it.

If the market value is $3.00 he must put up the whole thing. If the market value is $2.50, he must put up the whole thing.

If the market value is $1.00, he must put up $2.50, or 250 percent of the market price must be the maintenance margin requirement.

Tr. 191–93.

On Saturday, May 3, 1975, five days into the trading program, Fryling called Roebuck and requested withdrawal of $100,000 from his brokerage account. He also asked Roebuck for the current balance in his account. Roebuck reported that Fryling would have $30,000 in equity remaining after the withdrawal. Both parties understood this figure translated into $60,000 of short selling power.[5] The account information was based on figures supplied from New York, which were current through Wednesday, April 30, 1975. However, Fryling understood the information to be current as of Friday, May 2, 1975.

Believing he had substantial short selling power, Fryling continued trading the following Monday, May 5, 1975, and Tuesday, May 6, 1975. On Tuesday, Fryling again contacted Roebuck and requested his current account status. He was informed the office was working on the request. That same day the Merrill Lynch check for $100,000 arrived at Fryling's home.

Trading continued Wednesday, May 7, 1975, and Fryling called a third time regarding the account status. He was again told that Merrill Lynch was working on the request. Later in the afternoon of May 7, Roebuck was notified of a $41,000 maintenance call[6] on the Fryling account. Roebuck elected not to notify his client that evening but requested a detailed evaluation of the account for the following day.

On Thursday morning, May 8, 1975, Roebuck called Fryling and suggested that he suspend trading pending evaluation of the account. Sometime that afternoon, Roebuck received an accurate status report on Fryling's account. Thereupon, he called Fryling and notified him of a $91,000 maintenance call against the account.

The following day Fryling met with Roebuck and Dean Hutton, office manager at Merrill Lynch, to discuss the situation. He complained of the way Merrill Lynch had handled the account and determined to cease short selling and meet the maintenance call by covering his short positions.

It was a combination of circumstances which ultimately resulted in the Thursday maintenance call: (1) instead of falling, the market rose sharply, resulting in losses on virtually every short sale; (2) Fryling was allowed to withdraw $100,000 from his account, through a clerical error, even though there was insufficient equity to allow the withdrawal; (3) the New York office of Merrill Lynch was slow in getting Fryling's account information from its master computer to the Columbus, Ohio, office; (4) Fryling's large volume of trading made it difficult for the Columbus office to track the account manually; and (5) an error was made when the Columbus office attempted its own manual calculation of margin requirements, which delayed issuance of the maintenance call.

## II

Fryling's Rule 10b–5 cause of action is grounded on the confluence of two events. First, Fryling alleges that Roebuck gave him false information about margin requirements in their April 1975 telephone conversation. Second, the misinformation was compounded by the fact that Merrill Lynch repeatedly failed to monitor the Fryling account adequately or to provide Fryling with accurate account information. Fryling contends the combination of these facts, over a period of several days, could lead reasonable jurors to conclude that appellees manipulated the Fryling account for their own pecuniary gain. For this reason

5. Reg. T. requirements in effect during the relevant period provided the investor must put up 50 percent of the purchase price on an approved security. For every one dollar the investor deposits into a margin account, the brokerage house can lend the investor another dollar toward purchase of approved securities. This gives the investor, in effect, two dollars in buying power. See 12 C.F.R. §§ 220.3(c), (d), 220.8(a).

6. When an investor's equity in securities held in a margin account falls below maintenance levels required by the NYSE or individual brokerage house, the account is subject to a maintenance call. Within a reasonable time the investor must deposit more cash or acceptable securities into the margin account, or sell securities to cover the call. Failure to do so will result in unilateral action by the brokerage house to bring the account into balance.

it is contended that the district court erred in directing a verdict against count one of the complaint.

The difficulty with this analysis is that it lacks support in the record. The April telephone conversation with Roebuck was no more than a general discussion of margin requirements. Fryling asked a general question and received a correspondingly general response. The record shows that Roebuck was unaware that Fryling was about to liquidate his long positions, withdraw $100,000 in profits, and commence short trading in low-cost, speculative securities with the remaining funds. Without this essential background information we conclude that the question posed by Fryling was out of context and required no more detailed response than was provided.

Merrill Lynch aptly analogized:

It is much the same as if you walked up to a National League umpire and asked, "Are the rules of Baseball the same in both the American and National Leagues?," without telling the umpire you wanted to be a "designated hitter." Absent the latter key information, the umpire would almost certainly answer "yes" because the rules are essentially [generally] the same. Yet the league rules are dramatically different as to this one specialized aspect of the game. The same is true with respect to maintenance margin rules pertaining to short trading in very low-priced [securities].

The inability of Merrill Lynch to provide a daily up-date on the status of the brokerage account was the result of several factors, none of which evidences a deliberate or intentional scheme to manipulate Fryling's account or purposefully to keep him ignorant of the account status in order to stimulate further trading, and the commissions that trading would generate. Nor do we believe reasonable jurors could conclude that Roebuck's failure to notify his client of the Wednesday afternoon maintenance call, when it was first received, amounts to an intent to defraud. Rather, Roebuck determined to verify the information prior to the opening of market on Thursday, May 8, 1975. When that became impossible, Roebuck telephoned Fryling and advised him to suspend trading pending evaluation of the account.

In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court held that to recover under Rule 10b–5, a plaintiff must plead and prove an "intent to deceive, manipulate or defraud" in connection with a misrepresentation or omission to state material facts. 425 U.S. at 193–94 and n. 12, 96 S.Ct. at 1377. By requiring proof of scienter, the Court held that negligence was insufficient as a basis for 10b–5 liability. 425 U.S. at 214, 96 S.Ct. 1375.

Fryling seeks to distinguish *Hochfelder* on grounds of differences in pleading. In *Hochfelder*, the plaintiff pleaded only negligence, while Fryling notes that his action is predicated on fraud. We conclude there was no evidence from which the jury could have found appellees guilty of fraud. Even the most liberal reading of the facts in this case suggests nothing more than the possibility that appellees were negligent in handling the Fryling account. We agree with the district court that reasonable jurors could not have concluded that appellees acted with the requisite scienter.

Fryling argues that the conduct of appellees was reckless. The Supreme Court has specifically left open the question of whether reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b–5. *See Hochfelder*, 425 U.S. at 193–94 n. 12, 96 S.Ct. 1375. *See also*, Bucklo, *The Supreme Court Attempts to Define Scienter Under Rule 10b–5: Ernst & Ernst v. Hochfelder*, 29 Stan.L.Rev. 213, 227–40 (1977); *Rolf v. Blyth Eastman Dillon & Co., Inc.*, 570 F.2d 38 (2d Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). In view of our conclusion that Fryling has demonstrated no more than possible negligence, we do not reach the question of civil liability for reckless behavior.

Even if the record established (which it does not) that appellees engaged in a systematic scheme to defraud, Fryling would be faced with the task of establishing causation. Fryling contends that he was permitted too much credit by Merrill Lynch. To the contrary, the "omitted" maintenance

margin rules brought a halt to the Fryling short trading and limited the losses he suffered. Had the margin rules been what Fryling apparently believed them to be, he would have been granted even more credit and suffered further losses. Fryling acknowledged this on cross-examination:

Q. Isn't it a fact you just testified under oath when you were being examined by your counsel that if you hadn't liquidated those 40,000 shares that you had on Friday, that you would have been wiped out?

A. That's correct, subsequently.

The record demonstrates that market conditions, and not any representations or omission of appellees, caused the losses suffered by Fryling. We agree with the district court that the jury could not have reached any other conclusion from the evidence.

### III

Section 7(a) of the 1934 Act empowers the Board of Governors of the Federal Reserve Board to establish regulations "with respect to the amount of credit that may be initially extended and subsequently maintained" in connection with the purchase of approved securities. 15 U.S.C. § 78g(a). Section 7(c) makes it unlawful for a broker or dealer to extend, maintain, or arrange credit in the purchase of approved securities unless it is done in accordance with the rules prescribed by the Federal Reserve Board. 15 U.S.C. § 78g(c).

Pursuant to authority conferred upon it by the 1934 Act, §§ 7(a), (c)(1), (2); 15 U.S.C. §§ 78g(a), (c), the Federal Reserve Board adopted Regulation T, 12 C.F.R. § 220 et seq. Regulation T applies to "every broker or dealer, including every member of a national securities exchange." 15 U.S.C. § 78g(c); 12 C.F.R. § 220.1. Regulation T applies only to initial extension of credit in connection with the purchase of approved securities. There is no federal regulation of the maintenance of credit once it has been extended.[7]

Regulation T sets forth rules by which a "creditor" can extend credit to a "customer." All credit transactions must be effected through a General Margin Account. 12 C.F.R. § 220.3. Section 3(b), 12 C.F.R. § 220.3(b)(1), of the Regulation provides that the required margin (the cost of the security less the amount of credit which can be extended by the creditor upon initial purchase, 12 C.F.R. § 220.8(a)) must be deposited by the customer in the margin account "before the expiration of five full business days" following the purchase of an approved security. Failure to do so gives the creditor two alternatives. The creditor can apply for an extension of time or cancel the transaction. 12 C.F.R. § 220.3(e), (f). If this is not done, the creditor is in violation of the regulation. 15 U.S.C. § 78g(c).

Fryling contends that when Roebuck accepted his request to withdraw $100,000 from his brokerage account on Saturday, May 3, 1975, his margin account became immediately subject to a maintenance call. When he was permitted to continue short trading the following Monday through Thursday, Fryling contends that Regulation T was violated, giving rise to a cause of action thereunder.

We find no merit in this argument. Although Fryling's margin account was in a maintenance call position, there is no evidence of insufficient equity in the account to initiate more short sales. Fryling's maintenance margin requirements greatly exceeded his initial margin requirements. There is no evidence that Fryling's adjusted debit balance (the amount he owed to Merrill Lynch on previous extensions of credit, 12 C.F.R. § 220.3(d)) equaled or exceeded the maximum loan value of the securities in his margin account on Monday, May 5, 1975, or at any time thereafter. Fryling's own expert, Professor Johnson, conceded this on cross-examination:

Q. To your knowledge there was no Regulation T violation in this account; was there?

A. That's correct.

Q. That's correct; there was none?

A. Yes.

Q. When I say Regulation T, I am talking about, or when we use the term Regulation T violation, we are talking about

---

7. See note 3, supra. See also Waldman v. Sherman, Hammill & Co., Inc., [1973 74 Transfer Binder] Fed.Sec.L.Rptr. (CCH) ' 94,396 (D.N.J.1974).

the violation of the initial 50 percent margin requirement?

A. That's correct, and I might add, if I may, that that's because the maintenance requirement in this particular case was higher than the Regulation T margin requirement, [maintenance margin] therefore takes preceden[ce] over Regulation T.

The account analysis, prepared by Fryling's expert, suggested that if Merrill Lynch had calculated the status of the Fryling margin account on Saturday, the day withdrawal was requested, it would have discovered insufficient equity to satisfy maintenance requirements of the account. Dean Hutton, manager of the Columbus, Ohio, office, was asked to explain how the $100,000 could have been released from the Fryling account. He offered the following partial explanation:

Q. Let me go back a minute to the $100,000 cash withdrawal from Merrill Lynch. Mr. Young, in his opening statement, conceded that this check should not have been issued; is that correct?

A. It appears to be so, that's correct.

Q. Why is that? Let me ask that: Is that an error on the part of Merrill Lynch or what happened? Why was that check issued and now you say it was an error to have it issued?

A. Well, the way this is done is that an account executive or a customer will make a request for a check [to be] issued and the account executive will issue instructions to our Bookkeeping Department, and then it is the Bookkeeping Department's responsibility to verify that a check may very well indeed be sent out; that there is sufficient status or sufficient equity in the account so that a check can be sent out.

In this case, and in this account, I don't know the reason but apparently the check was sent out even though there was not sufficient equity in the account to allow it to be sent out.

Q. I have asked Mr. Roebuck if there was any policy on the part of Merrill Lynch for a check that size, that he should have asked somebody to get permission.

A. No, that's not Mr. Roebuck's responsibility.

Q. Do you know today whose error it was?

A. I have no idea. I suspect that it was a combination of things; the trading activity was so intense we were having a great deal of difficulty trying to follow the account, trying to keep up, a most unusual kind of an account, one that I have never seen before; I have never seen that kind of activity in my life.

It is obvious that calculation of the maintenance status of an account the size of Fryling's, with its large trading volume, could not have been made realistically until the withdrawal was charged against the account in the context of current trading activity. This occurred on Tuesday, May 6, 1975. Therefore, short sales with insufficient initial margin could not have been made until Tuesday, May 6, 1975, the day the $100,000 was charged to the margin account.

Finally, Regulation T is not violated until a creditor fails to take appropriate action to rectify an initial margin imbalance before "the expiration of five full business days following the date of such transaction." Accordingly, Merrill Lynch did not need to take corrective action on the Fryling account until Tuesday, May 13, 1975. Fryling testified that he had liquidated the bulk of his short positions by Tuesday, May 13, 1975.

We conclude that appellees did not violate Regulation T. We do not reach the question of whether Fryling could have a private right of action under the regulation.[8]

8. For contrasting views on this issue, *compare Pearlstein v. Scudder & German* (Pearlstein I), 429 F.2d 1136 (2d Cir. 1970), *cert. denied*, 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971), *with Pearlstein v. Scudder & German* (Pearl- stein II), 527 F.2d 1141, 1145 n. 2 (2d Cir. 1975); *Utah State University v. Bear, Stearns & Co.*, 549 F.2d 164 (10th Cir.), *cert. denied*, 434 U.S. 890, 98 S.Ct. 264, 54 L.Ed.2d 176 (1977).

## IV

As to the count three theory of recovery, we agree with the district court that Fryling has not stated a cause of action for breach of fiduciary duty under state law.[9] Rather, he alleges violations of Rules 402, 431 and 432 of the NYSE and Art. III, § 2 of the Rules of Fair Practice of the NASD. His contentions thereunder are without merit.

For example, Rule 431(b) of the NYSE provides:

(b) The margin which must be maintained in margin accounts of customers, whether members, allied members, member organizations or non-members, shall be as follows:

(1) 25% of the market value of all securities "long" in the account; plus

(2) $2.50 per share or 100% of the market value, in cash, whichever amount is greater, of each stock "short" in the account selling at less than $5.00 per share; plus

(3) $5.00 per share or 30% of the market value, in cash, whichever amount is greater, of each stock "short" in the account selling at $5.00 per share or above; plus

(4) 5% of the principal amount or 30% of the market value, in cash, whichever amount is greater, of each bond "short" in the account.

A broker is charged to seek customer compliance with Rule 431 "as promptly as possible and in any event within a reasonable time." Rule 431(d)(6). The record demonstrates that Merrill Lynch acted to correct the Fryling maintenance imbalance as soon as accurate account information was available. The fact that Roebuck elected to wait for more complete information on the Fryling account when he first received the Wednesday afternoon maintenance call does not, in our opinion, amount to unreasonable delay under the rule.

Affirmed.

## APPENDIX

Account No. 43545

| Name of Security | SOLD SHORT Date of Sale | Quantity | Price | PURCHASED TO COVER SHORT Date of Purchase | Quantity | Price |
|---|---|---|---|---|---|---|
| Horizon Corp. | 4/28/75 | 900 | 2 1/2 | 5/12/75 | 900 | 2 5/8 |
| California Financial | 4/28/75 | 1,400 | 3 1/4 | 5/9/75 | 1,400 | 3 3/4 |
| Horizon Corp. | 4/29/75 | 700 | 2 1/2 | 5/12/75 | 700 | 2 5/8 |
| AMREP Corp. | 4/29/75 | 800 | 2 1/8 | 5/9/75 | 800 | 2 1/2 |
| Gibraltar Fin'l Cal. | 4/29/75 | 100 | 9 3/8 | 5/9/75 | 100 | 11 1/2 |
| Redman Indus. | 4/29/75 | 100 | 3 | 5/9/75 | 100 | 3 1/2 |
| California Financial | 4/29/75 | 600 | 3 1/4 | 5/9/75 | 600 | 3 3/4 |
| Champion Home Bldrs. | 4/29/75 | 3,000 | 3 3/4 | 5/9/75 | 3,000 | 4 |
| Tishman Realty/Const. | 4/30/75 | 1,000 | 10 7/8 | 5/13/75 | 600 | 11 1/4 |
|  |  |  |  | 5/14/75 | 400 | 11 3/8 |
| Redman Indus. | 4/30/75 | 2,000 | 3 | 5/9/75 | 2,000 | 3 1/2 |
| Chrysler Corp. | 4/30/75 | 1,000 | 10 1/8 | 5/9/75 | 1,000 | 10 3/4 |
| White Motor | 4/30/75 | 200 | 8 1/2 | 5/9/75 | 200 | 8 7/8 |
| National Homes | 4/30/75 | 2,000 | 3 5/8 | 5/9/75 | 2,000 | 4 |
| Talcott National | 4/30/75 | 100 | 3 1/2 | 5/13/75 | 100 | 3 3/8 |
| General Development | 4/30/75 | 100 | 4 7/8 | 5/13/75 | 100 | 5 1/8 |
| California Financial | 4/30/75 | 1,000 | 3 1/4 | 5/9/75 | 1,000 | 3 3/4 |
| Gibralter Financial Cal. | 4/30/75 | 1,900 | 9 1/8 | 5/9/75 | 1,900 | 11 1/2 |
| Horizon Corp. | 4/30/75 | 200 | 2 1/2 | 5/12/75 | 200 | 2 5/8 |
| AMREP Corp. | 4/30/75 | 300 | 2 1/8 | 5/9/75 | 300 | 2 1/2 |
| AMREP Corp. | 5/1/75 | 900 | 2 1/8 | 5/9/75 | 900 | 2 1/2 |
| National Homes | 5/1/75 | 100 | 3 1/2 | 5/9/75 | 100 | 4 |

9. It is not necessary to reach the question of whether one can state a claim for breach of common law fiduciary duties, see Comment, *Broker Dealers, Market Makers and Fiduciary Duties*, 9 Loy.Chi.L.J. 746 (1978), since we hold that Fryling has not done so in this case.

Account No. 43545

| | SOLD SHORT | | | PURCHASED TO COVER· SHORT | | |
|---|---|---|---|---|---|---|
| Name of Security | Date of Sale | Quantity | Price | Date of Purchase | Quantity | Price |
| White Motor | 5/1/75 | 500 | 8 1/2 | 5/9/75 | 500 | 8 7/8 |
| American Motors | 5/1/75 | 1,000 | 5 1/4 | 5/9/75 | 1,000 | 5 3/8 |
| Horizon Corp. | 5/1/75 | 400 | 2 1/2 | 5/13/75 | 400 | 2 5/8 |
| National Homes | 5/2/75 | 1,900 | 3 1/2 | 5/9/75 | 1,900 | 4 |
| White Motor | 5/2/75 | 300 | 8 1/2 | 5/9/75 | 300 | 8 7/8 |
| Deltona Corp. | 5/2/75 | 200 | 6 1/4 | 5/9/75 | 200 | 5 1/2 |
| General Development | 5/2/75 | 900 | 4 5/8 | 5/12/75 | 900 | 5 1/8 |
| Talcott National | 5/2/75 | 400 | 3 1/2 | 5/13/75 | 400 | 3 3/8 |
| ICN Pharmaceuticals | 5/5/75 | 1,000 | 3 | 5/9/75 | 1,000 | 3 5/8 |
| Deltona Corp. | 5/5/75 | 500 | 6 1/4 | 5/9/75 | 500 | 6 1/2 |
| Hecla Mining | 5/5/75 | 300 | 17 1/4 | 5/12/75 | 300 | 18 3/8 |
| United Brands | 5/5/75 | 1,000 | 4 7/8 | 5/13/75 | 1,000 | 5 1/2 |
| United Inns | 5/5/75 | 1,000 | 4 1/8 | 5/9/75 | 900 | 4 3/4 |
| | | | | | 100 | 4 5/8 |
| Donaldson, Hulfkin [sic] & Jenn | 5/5/75 | 1,000 | 3 7/8 | 5/13/75 | 300 | 3 1/2 |
| | | | | 5/14/75 | 700 | 3 3/8 |
| United Brands | 5/6/75 | 2,100 | 4 3/4 | 5/13/75 | 2,100 | 5 1/2 |
| Deltona Corp. | 5/6/75 | 100 | 6 1/4 | 5/9/75 | 100 | 6 1/2 |
| Horizon Corp. | 5/6/75 | 300 | 2 3/8 | 5/12/75 | 300 | 2 5/8 |
| Talcott National | 5/6/75 | 400 | 3 1/4 | 5/13/75 | 400 | 3 3/8 |
| National Homes | 5/6/75 | 1,000 | 3 1/2 | 5/9/75 | 1,000 | 4 |
| Redman Indus. | 5/7/75 | 900 | 2 3/4 | 5/9/75 | 900 | 3 1/2 |
| American Motors | 5/7/75 | 1,000 | 5 3/8 | 5/9/75 | 1,000 | 5 3/8 |
| National Homes | 5/7/75 | 2,000 | 3 1/2 | 5/9/75 | 2,000 | 4 |
| Helca Mining [sic] | 5/7/75 | 700 | 17 1/8 | 5/12/75 | 700 | 18 3/8 |
| United Brands | 5/7/75 | 1,900 | 4 7/8 | 5/13/75 | 1,900 | 5 1/2 |
| Horizon Corp. | 5/8/75 | 500 | 2 1/4 | 5/12/75 | 500 | 2 5/8 |
| Deltona Corp. | 5/8/75 | 200 | 6 1/8 | 5/9/75 | 200 | 6 3/8 |
| Talcott National | 5/8/75 | 100 | 3 1/4 | 5/13/75 | 100 | 3 3/8 |