Gerald MANSBACH, Plaintiff-Appellant,

v.

PRESCOTT, BALL & TURBEN et al.,
Defendants-Appellees.

No. 77–3226.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 20, 1979.

Decided May 7, 1979.

**1018**

Barnett & Alagia, Jack E. Ruck, Bernard H. Barnett, Louisville, Ky., for plaintiff-appellant.

Charles S. Cassis, Hal Nance Bogard, Brown, Todd & Heyburn, Louisville, Ky., for defendants-appellees.

Before CELEBREZZE and LIVELY, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

CELEBREZZE, Circuit Judge.

Plaintiff-appellant, Gerald Mansbach, brought this action against Prescott, Ball & Turben (PBT), a regional securities broker-dealer, and its general partners. The complaint alleged various violations of the federal securities laws and corresponding state law claims based on diversity jurisdiction. The district court dismissed the federal claims for failure to state a claim upon which relief can be granted and stayed proceedings on the state claims pending arbitration. We reverse.

## FACTS

Since the district court disposed of the case on a motion to dismiss, we have before us only the allegations of the complaint. We assume the truth of the allegations in order to determine whether the complaint states a claim upon which relief can be granted.

Mansbach is an individual investor and a resident of Kentucky. PBT is a securities broker-dealer doing business as a limited partnership organized under the laws of Ohio with its principal place of business in Cleveland. The events involved here arose from PBT's Louisville, Kentucky, office. The general partners of PBT joined as defendants are all residents of states other than Kentucky.

The complaint alleges that in early 1974 Mr. John Siegel[1] entered the employ of PBT at the Louisville office. Not long thereafter Siegel solicited Mansbach to engage PBT as a stockbroker and investment adviser. In particular, Siegel encouraged Mansbach to enter the options market, in which Siegel thought good profits could be made. Mansbach accepted this invitation and delivered to PBT 300 corporate bonds having a total face value of $300,000 as collateral for his anticipated transactions with PBT.

On April 25, 1974, Mansbach was called by Siegel, who related that PBT's financial analysis of Upjohn Corporation indicated that the price of Upjohn's stock would materially decrease over the next few months. Siegel recommended that Mansbach "sell short an unspecified number of options in Upjohn stock on the basis and belief that when the stock declined in value, [Mansbach] would make a profit on the transaction by retaining the purchase price of the options he had sold, less commission. If the stock were to rise in price above a predetermined 'striking price,' [Mansbach] understood that he would be required to enter the market, buy shares of the corporation at the then current market price, and sell those shares to the buyer of the options at the 'striking price.' In this event, he would lose the difference between the market price and the 'striking price' on each share, which loss would then be offset by the amount received in the original sales of the options." (Complaint, ¶ 10.)

Mansbach relied upon Siegel's advice and authorized PBT to sell short 100 options, each option representing 100 shares of Upjohn stock (10,000 shares total). The stock was then selling at 67¼ and the striking price for the options was 75. The options expired July 31, 1974. PBT sold the 100

---

1. Siegel was not joined as a defendant, presumably to preserve complete diversity.

options on April 25 for prices ranging from 2½ to 2⅞, with a net to Mansbach of $25,-429.50.[2]

By April 29, Mansbach had second thoughts about PBT's forecast for Upjohn. Worried that the price would rise above the striking price, Mansbach advised Siegel that he wanted to purchase fifty Upjohn options, each option again representing 100 shares of stock (5000 shares total). Thus, if the price of Upjohn stock rose above 75 by July 31, Mansbach would only have to buy an additional 5000 shares on the market for sale at the striking price to the holders of the options he had sold.

Siegel allegedly failed to execute this order for fifty Upjohn options on April 29. The opening quote for the options that day was 2⅜, but it rose during the day's trading session. Siegel did not inform Mansbach of this development until after the market had closed on April 29, explaining that he had not purchased any of the fifty options because the 2⅜ quote had not been available. Mansbach expressed his displeasure with this failure to purchase by Siegel, saying it was imperative to buy the fifty options.

Siegel called Mansbach the next morning, April 30, and explained that the Upjohn option price had risen to 3½. Mansbach instructed Siegel to buy the fifty options. Siegel called Mansbach later that day and said that he had purchased forty Upjohn options at 3½[3] but that the price was still rising and he wanted further instructions. Mansbach instructed Siegel that forty options would suffice and no more should be purchased that day.

The price of Upjohn stock had climbed well above the striking price (75) by May 9, 1974. Mansbach therefore contacted Siegel on May 10 and ordered Siegel to purchase an additional sixty Upjohn options at the market price in order to reduce the potential loss if the stock price continued to rise. Contrary to these instructions, PBT pur-chased sixty-three Upjohn options for Mansbach at prices ranging from 7 to 8⅜, for a total cost to Mansbach of $50,732.55.[4] Siegel called Mansbach later on May 10 and told Mansbach that he had purchased sixty-three options rather than the requested sixty because a PBT secretary made a clerical error in the earlier transaction so that only thirty-seven instead of forty options had actually been purchased then.

Mansbach told Siegel that he would not pay the additional cost of the three options purchased on May 10 which should have been purchased on April 29 or 30 when their price was lower. Siegel assured Mansbach that PBT would assume responsibility for that amount. Mansbach was apparently frustrated by Siegel's alleged ineptness, however, and informed Siegel that he should prepare a complete statement of what Mansbach owed PBT. Mansbach said he would pay this entire amount immediately in order to obtain the bonds pledged to PBT as collateral. Siegel informed Mansbach that his current balance showed that he owed PBT a total of $27,247.31 for both the Upjohn and other transactions. Mansbach paid this entire amount by check, which payment was credited to Mansbach's account on May 20.

By early June Mansbach had not received any verification of his $27,247.31 payment, nor had he received his pledged bonds. On or about June 10, Mansbach called Siegel and demanded return of the bonds. Siegel acknowledged receipt of the $27,247.31 but contended that Mansbach owed PBT an additional $1,069.86. This additional sum arose from PBT's determination that it was not liable for the failure to purchase all forty options ordered on April 30, despite Siegel's prior representation that PBT would assume this difference in cost. Mansbach denied liability for this additional amount and again demanded return of the bonds.

---

2. The gross amount realized was $26,187.50 and PBT received a commission of $758.00.

3. The cost to Mansbach was not alleged but presumably was $14,000 (40 × 100 × 3½) plus commission.

4. The cost of the options was $49,687.50 and PBT received a commission of $1,045.05.

On or about June 13, Mansbach called Mr. Gary Tarbis,[5] the manager of the Louisville PBT office, who was unaware of the situation. After investigation, Tarbis called Mansbach later on June 13 and informed Mansbach that PBT would assume responsibility for the failure to purchase all forty options when initially ordered so that Mansbach's account was entirely paid. Tarbis stated that the pledged bonds would be returned to Mansbach but only after Mansbach executed a written release absolving PBT and its employees from all liability in connection with the option trading. Mansbach refused to execute such a release.

Mansbach called Siegel on June 25 and repeated his demand for the bonds. Siegel confirmed that Mansbach owed PBT nothing but he still refused to release the bonds until Mansbach executed a release. Mansbach again refused to do so.

On July 2, PBT offered to return to Mansbach 295 of the 300 bonds which was done on July 8. Mansbach sold these 295 bonds on July 9, allegedly at a loss due to the lowering of their market price between the time Mansbach demanded their return and the time of their return. As of the date of filing of the complaint (August 1, 1974), PBT continued to hold the remaining five bonds.[6]

## PROCEDURAL HISTORY

Mansbach filed his complaint in the district court for the Western District of Kentucky. It alleged the facts related above and contained appropriate jurisdictional allegations and demanded a jury trial. The complaint was framed in three counts.

Count I sought relief from the actions of Siegel, as PBT's agent and employee, in failing to execute Mansbach's order to purchase fifty Upjohn options on April 29, in failing to properly execute Mansbach's renewed order to purchase the fifty options on April 30, in representing that forty op-

tions had been purchased when only thirty-seven had been purchased, and in purchasing sixty-three options on May 10 contrary to the instructions to purchase only sixty. Mansbach contended these facts stated a claim for relief under the federal securities laws, Kentucky statutory law on fraud, common law fraud and breach of contract, the Rules of Fair Practice of the National Association of Securities Dealers (NASD), and the applicable options exchange rules. Mansbach prayed for $11,734.17 in damages, plus costs, interest and attorney fees.

Count II sought relief from the actions of Siegel and Tarbis, as PBT's agents and employees, in refusing to return the corporate bonds Mansbach had pledged to PBT as collateral unless Mansbach released PBT from liability despite the fact that Mansbach owed PBT no money. Mansbach stated that this alleged conversion of his bonds stated a claim for relief under the federal securities laws, the Kentucky fraud statute, common law fraud and conversion, the NASD rules, and the options exchange rules. Mansbach prayed for $55,312.50 in damages for conversion of the 295 bonds eventually returned, for an undetermined amount in damages for conversion of the remaining five bonds and for their return,[7] for $75,000 in punitive damages, and for costs, interest and attorney fees.

Count III sought relief from all of the above alleged actions based on PBT's failure to properly supervise the activities of its agents and employees. This count sought no further damages beyond those prayed for in Counts I and II.

In response to the complaint, defendants (referred to collectively as PBT) filed a motion to dismiss those portions of the complaint which sought to rely upon the federal securities laws for failure to state a claim upon which relief can be granted. PBT also filed a motion to stay all proceedings on all other aspects of the case pending

---

**5.** Tarbis was not joined as a defendant, presumably to preserve complete diversity.

**6.** The record indicates that after the complaint was filed PBT returned the last five bonds to

Mansbach, who paid $1,069.86 into the court registry pending the outcome of the case.

**7.** See note 6, *supra.*

arbitration. The latter was based upon the written customer agreement executed by Mansbach and PBT at the outset of their relationship which called for arbitration of controversies arising thereunder.

■ The district court initially denied both motions since it felt Count II "alleged facts which, if proved, constitute clear violation of" the federal securities laws. The court was less certain that Count I stated a federal claim for relief but said there was "pendent jurisdiction" as to that count.[8]

Upon PBT's motion for reconsideration, the district court reversed itself and granted the motion to dismiss the federal claims. In its opinion, the court ruled that Count I of the complaint alleged no more than negligent clerical errors and innocent incompetence by PBT. Correctly anticipating the Supreme Court's subsequent decision in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the court held that mere negligence was not actionable under Securities Exchange Act § 10(b) and SEC Rule 10b–5 promulgated thereunder.[9] As to Count II, the court ruled that the alleged conversion of Mansbach's bonds was not "in connection with the purchase or sale of any security," as required by § 10(b) and Rule 10b–5. Therefore, the court dismissed those aspects of Counts I and II purporting to rely on the federal securities laws.[10] The court did not specifically address the allegations of Count III.

In its opinion, the district court also ruled that it would hold a hearing on the enforceability of the arbitration agreement. After the hearing, the court initially ruled the agreement unenforceable and refused to stay proceedings pending arbitration. Upon PBT's motion for reconsideration, the court reversed itself and found the agreement enforceable and ordered the action stayed pending arbitration. It is from this order that Mansbach appeals.

## APPEALABLE ORDER

■ We must initially determine whether this court has jurisdiction by deciding whether there exists an appealable order below.[11] 28 U.S.C. § 1292(a)(1) grants jurisdiction to the courts of appeals in appeals from "interlocutory orders of the district courts . . . granting . . . refusing or dissolving injunctions, or refusing to dissolve or modify injunctions . . . ." We hold that the district court's order staying proceedings pending arbitration comes within this statutory language.

The law on this matter is largely an historical anomaly but well-settled nonetheless. The rule is that an order staying or refusing to stay a pending action until the case is submitted to arbitration is appealable if the underlying action is legal in nature and not appealable if the underlying

---

**8.** This was an incorrect use of the term "pendent jurisdiction." Pendent jurisdiction refers to a federal court's power to hear a claim, usually arising under state law, as to which there is no independent federal jurisdiction. The claim can be heard if it is "pendent" to a substantial claim as to which federal jurisdiction exists. *See Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976); *UMW v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); 3A J. Moore, Moore's Federal Practice ⁌ 18.07[1.–2 to 1.–5] (2d ed. 1978) (hereinafter "Moore's"). Here, there was federal jurisdiction as to all claims under either the federal securities laws or diversity of citizenship. The district court had *independent* federal jurisdiction as to all state law claims, not *pendent* jurisdiction.

**9.** The district court ruled that Mansbach's claim based upon Securities Act § 17(a) should

be treated as incorporated into the § 10(b)/Rule 10b–5 claim and analyzed on the same basis. We do not address this issue.

**10.** The district court also held that there was no private right of action for an alleged violation of Securities Exchange Act § 15(c)(3), 15 U.S.C. § 78*o*(c)(3), and SEC Rule 15c3–3 promulgated thereunder, 17 C.F.R. § 240.15c3–3. Our disposition of the § 10(b)/Rule 10b–5 claims makes decision of this issue unnecessary.

**11.** PBT previously filed a motion to dismiss this appeal on the grounds that there was no appealable order. Assigned to this court's administrative docket, the motion was denied. We adhere to that ruling and offer the following by way of explanation.

action is equitable in nature. 9 Moore's ¶ 110.20[3].[12] This rule has been criticized as being based on outmoded distinctions between law and equity, id. at 245–46, but it is firmly embedded in several Supreme Court cases.[13] The Supreme Court itself has noted the "incongruity" of the distinction but concluded that it should "follow the precedents" and allow "Congress to make such amendments as it may find proper."[14]

Applying the rule to the instant case, it dictates that the stay order is appealable inasmuch as the predominant nature of the action below is legal.[15] Moreover, since the order staying the proceedings is appealable, we also have power to review the district court's prior order dismissing the federal securities laws claims since the stay order was dependent upon that prior ruling. 9 Moore's ¶ 110.25[1]

## RECKLESSNESS AS SCIENTER UNDER § 10(b) AND RULE 10b–5

In Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976),[16] the Supreme Court held that a private claim for relief under § 10(b) of the Securities Exchange Act of 1934 [17] and SEC Rule 10b–5 [18] promulgated thereunder will not lie in the absence of any allegation of "scienter" on the part of the defendant. The precise holding of the case was that mere negligence was not actionable under § 10(b) and Rule 10b–5. The Court expressly left open the question whether recklessness would suffice as scienter.[19] We hold that recklessness is a sufficiently culpable state of mind for liability under § 10(b) and Rule 10b–5.[20]

The overwhelming majority of courts to address this question after Hochfelder have concluded that recklessness satisfies the § 10(b)/Rule 10b–5 scienter requirement.[21]

**12.** See also Dorton v. Collins & Aikman Corp., 453 F.2d 1161, 1163 (6th Cir. 1972); Buffler v. Electronic Computer Programming Institute, Inc., 466 F.2d 694, 696 n. 2 (6th Cir. 1972).
 For cases applying the rule in factual settings similar to the instant case, see Weissbuch v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 558 F.2d 831, 833 (7th Cir. 1977); Ayres v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 538 F.2d 532, 535 n. 6 (3d Cir.), cert. den. 429 U.S. 1010, 97 S.Ct. 542, 50 L.Ed.2d 619 (1976).

**13.** Baltimore Contractors, Inc. v. Bodinger, 348 U.S. 176, 75 S.Ct. 249, 99 L.Ed. 233 (1955); City of Morgantown v. Royal Ins. Co., 337 U.S. 254, 69 S.Ct. 1067, 93 L.Ed. 1347 (1949); Ettelson v. Metropolitan Life Ins. Co., 317 U.S. 188, 63 S.Ct. 163, 87 L.Ed. 176 (1942); Enelow v. New York Life Ins. Co., 293 U.S. 379, 55 S.Ct. 310, 79 L.Ed. 440 (1935).

**14.** Baltimore Contractors, supra, 348 U.S. at 184–85, 75 S.Ct. at 254.

**15.** Since PBT returned the last five bonds to Mansbach after the complaint was filed, see note 6, supra, the only remaining claims are for money damages, which are clearly legal in nature. 9 Moore's ¶ 110.20[3], at 243.

**16.** Incredibly, Mansbach's brief in this court, filed over fifteen months after the Supreme Court's decision in Hochfelder, pretermits any mention of that case. See ABA Code of Professional Responsibility Canon 6 and DR 6–101(A)(2).

**17.** 15 U.S.C. § 78j(b).

**18.** 17 C.F.R § 240.10b–5.

**19.** In this opinion the term "scienter" refers to a mental state embracing intent to deceive, manipulate, or defraud. In certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act. We need not address here the question whether, in some circumstances, reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b–5.
 425 U.S. at 193–94 n. 12, 96 S.Ct. at 1381 n. 12.

**20.** This issue was noted but not decided by this court in Fryling v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 593 F.2d 736, 743 (6th Cir. 1979). See also Nickels v. Koehler Management Corp., 541 F.2d 611, 617 (6th Cir. 1976).

**21.** For pre-Hochfelder commentary on the issue, see, e. g., Bucklo, Scienter and Rule 10b–5, 67 Nw.U.L.Rev. 562 (1972); Note, Securities, Regulation—Rule 10b–5: Development of an Inquiry Notice Standard of Conduct in the Second Circuit, 35 Ohio St.L.J. 441 (1974). See also SEC v. Coffey, 493 F.2d 1304, 1314 (6th Cir. 1974), cert. den. 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975) (adopting recklessness standard in pre-Hochfelder SEC injunctive action); SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 868 (2d Cir. 1968) (Friendly, J., concurring), cert. den. 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

This conclusion has been reached by the second,[22] third,[23] fifth,[24] seventh,[25] and ninth [26] circuits and several district courts.[27] We need only briefly explain our reasons for agreeing with this impressive array of authority.

The implied claim for relief stated under § 10(b) and Rule 10b–5 is essentially the federal securities law counterpart to the common law tort of fraud. The § 10(b)/Rule 10b–5 claim is not identical to common law fraud, *see James v. Gerber Products Co.*, 483 F.2d 944, 946 (6th Cir. 1973),[28] but, particularly after *Hochfelder*, it is very useful to analogize between the two, *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1044 (7th Cir.), *cert. den.* 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977); *Holdsworth v. Strong*, 545 F.2d 687, 693–94 (10th Cir. 1976), *cert. den.* 430 U.S. 955, 97 S.Ct. 1600, 51 L.Ed.2d 805 (1977).[29] At common law, recklessness satisfied the scienter requirement for fraud.

*Derry v. Peek*, [L.R. 1889] 14 A.C. 337, 374; W. Prosser, Law of Torts § 107, at 700–01 (4th ed. 1971); Restatement of Torts § 526(b).[30] Drawing upon the analogy between the § 10(b)/Rule 10b–5 claim and common law fraud, it is appropriate to hold that recklessness constitutes sufficient scienter for both.[31]

Cases abound which hold that the § 10(b)/Rule 10b–5 claim for relief is to be liberally construed in order to effectuate the policies underlying the federal securities laws. *See, e. g., Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Superintendent of Insurance v. Bankers Life and Cas. Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). *See also SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). In line with that rule of construction, we should construe the § 10(b)/Rule 10b–5 claim no more

**22.** *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 44 (2d Cir.), *cert. den.* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978), *aff'g* 424 F.Supp. 1021 (S.D.N.Y.1977).

The holding in *Rolf* was limited to the facts of that case, *viz.*, a defendant who owed a fiduciary duty to the plaintiff. We see no reason to impose such a limitation. *See Edwards & Hanly v. Wells Fargo Securities Clearance Corp.*, 458 F.Supp. 1110, 1122–23 & n. 9 (S.D.N.Y. 1978).

**23.** *Coleco Industries, Inc. v. Berman*, 567 F.2d 569, 574 (3d Cir. 1977), *cert. den.* 439 U.S. 830, 99 S.Ct. 106, 58 L.Ed.2d 124 (1978), *aff'g* 423 F.Supp. 275, 296 (E.D.Pa.1976).

**24.** *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1314 (5th Cir. 1977), *cert. den.* 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978).

**25.** *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1039–40 (7th Cir.), *cert. den.* 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977). *See also Goodman v. Epstein*, 582 F.2d 388, 403–05 (7th Cir. 1978); *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 792–93 (7th Cir. 1977); *Bailey v. Meister Brau, Inc.*, 535 F.2d 982, 993–94 (7th Cir. 1976).

**26.** *Nelson v. Serwold*, 576 F.2d 1332, 1337 (9th Cir.), *cert. den.* 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978).

**27.** *See, e. g., Sullivan v. Chase Investment Services of Boston, Inc.*, 79 F.R.D. 246, 270

(N.D.Cal.1978); *In re Transocean Tender Offer Securities Litigation*, 455 F.Supp. 999, 1010–11 (N.D.Ill.1978); *Valente v. Pepsico, Inc.*, 454 F.Supp. 1228, 1250 (D.Del.1978); *Indiana National Bank v. Mobil Oil Corp.*, 457 F.Supp. 1028, 1032–33 (S.D.Ind.1977); *Felts v. National Account Systems Ass'n, Inc.*, 446 F.Supp. 357, 360 (N.D.Miss.1977); *Stern v. American Bankshares Corp.*, 429 F Supp. 818, 825 (E.D.Wis. 1977); *McLean v. Alexander*, 420 F.Supp. 1057, 1080 (D.Del.1976). *But cf. SEC v. American Realty Trust*, 429 F.Supp. 1148, 1171 & n. 8 (E.D.Va.1977), *rev'd on other grounds* 586 F.2d 1001 (4th Cir. 1978).

**28.** See 587 F.2d 324 (6th Cir. 1978), for subsequent proceedings in *James*.

**29.** *See also Marsh v. Armada Corp.*, 533 F.2d 978, 983 (6th Cir. 1976), *cert. den.* 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803 (1977), decided six days after *Hochfelder*, equating Rule 10b–5 with fraud but not subjecting it to the limitations of common law fraud.

**30.** *See also Ultramares Corp. v. Touche*, 255 N.Y. 170, 190, 174 N.E. 441, 449 (1931) (Cardozo, C. J.); *State Street Co. v. Ernst*, 278 N.Y. 104, 112, 15 N.E.2d 416, 418–19 (1938).

**31.** This reasoning was employed in *Rolf, supra*, 570 F.2d at 46; *Sundstrand, supra*, 553 F.2d at 1044; and *McLean, supra*, 420 F.Supp. at 1080 & n. 118.

narrowly then required by *Hochfelder*.[32] Requiring a plaintiff to show that the defendant acted with actual subjective intent to defraud could impose a great burden upon recovery, greatly limiting the § 10(b)/Rule 10b–5 claim.[33] We believe that *Hochfelder* should be read to go no further than its specific holding that mere negligence is not enough for liability.

We also note that in another context the Supreme Court has held that recklessness suffices to meet what would otherwise appear to be a subjective fault standard. For a defamation plaintiff to overcome the first amendment privilege accorded to persons speaking about public officials and public figures, he must prove that the defendant acted with "actual malice." But "actual malice" is defined to mean "with knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964); *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). This is obviously not directly on point in the instant case but is indicative of a general equation of recklessness with subjective intent (scienter) in tort law.

Finally, we note the consensus among the commentators that recklessness should be sufficient to meet the scienter requirement articulated in *Hochfelder*. *See* Metzger & Heintz, Hochfelder's Progeny: Implications for the Auditor, 63 Minn.L.Rev. 79 (1978); *Bucklo, The Supreme Court Attempts to Define Scienter Under Rule 10b–5: Ernst & Ernst v. Hochfelder*, 29 Stan.L.Rev. 213 (1977);[34] Haimoff, Holmes Looks at Hochfelder and 10b–5, 32 Bus.Law. 147 (1976); Note, Recklessness Under Section 10(b): Weathering the *Hochfelder* Storm, 8 Rutgers-Camden L.J. 325 (1977).

It is not necessary for us to precisely define what constitutes reckless behavior since it is ultimately a factual determination which will necessarily vary from case to case. As a general matter, however, we express our agreement with the standard articulated in *Sundstrand, supra*, 553 F.2d at 1045.[35] The seventh circuit there held that recklessness was highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it.[36]

### MANSBACH'S CLAIMS

It has been stated that § 10(b) and Rule 10b–5 govern six distinct factual patterns: 1) trading on the basis of undisclosed material information; 2) issuing misleading corporate publicity; 3) selectively disclosing important nonpublic data ("tipping"); 4) manipulating a securities market; 5) mismanaging a corporation; and 6) trading and other activities of broker dealers.[37] Here, we are concerned with the sixth cate-

---

**32.** The narrowing construction in *Hochfelder* was not adopted as a policy matter but was seen as mandated by the relevant statutory language. 425 U.S. at 214, 96 S.Ct. 1375.

**33.** *See Rolf, supra*, 570 F.2d at 47.

**34.** Bucklo notes that recklessness would also be sufficient culpability for recovery under the American Law Institute's proposed Federal Securities Code. 29 Stan.L.Rev. at 240 & nn. 203–04.

**35.** *Quoting Franke v. Midwestern Oklahoma Development Authority*, 428 F.Supp. 719 (W.D. Okla.1976).

**36.** In *Sanders, supra*, 554 F.2d at 793, the seventh circuit noted that this standard is closer to a lesser form of intent than a greater form of negligence. We think it suffices to say that the standard falls somewhere between intent and negligence. There is little analytical value in deciding precisely where along this spectrum recklessness falls. This is true, a fortiori, when formulating jury instructions.

**37.** Jacobs, The Role of Securities Exchange Act Rule 10b–5 in the Regulation of Corporate Management, 59 Corn.L.Rev. 27, 29 (1973); Jacobs, The Impact of Securities Exchange Act Rule 10b–5 on Broker-Dealers, 57 Corn.L.Rev. 869, 870–71 (1972).

*See also* Note, SEC Rule 10b–5: Constructive Fraud and the Liabilities of Fiduciaries, 35 Ohio St.L.J. 934 (1974), suggesting a seventh pattern, *viz.*, activities of fiduciaries.

gory—trading and other activities of broker-dealers.[38]

The elements necessary to state a claim for relief will, of course, vary somewhat depending upon which factual pattern is involved. As a general matter, however, private § 10(b)/Rule 10b–5 damage claims can be said to require: 1) the use of jurisdictional means 2) to implement a deceptive or manipulative practice (with the requisite scienter) 3) in connection with 4) the purchase or sale 5) of a security 6) causing 7) damages.[39] We now turn to whether Mansbach's complaint states a claim upon which relief can be granted in light of these general requirements.

## COUNT I

■ The thrust of Count I of the complaint is that PBT, through its agent and employee Siegel, improperly executed Mansbach's orders for the Upjohn options. PBT does not dispute that the complaint adequately alleges the use of jurisdictional means and that the events that transpired were in connection with the purchase or sale of securities[40] and caused Mansbach damages. The dispute centers on whether Mansbach has adequately alleged the use of a manipulative or deceptive practice with the requisite scienter.

We have no trouble holding that the alleged actions of PBT, if performed with the requisite scienter, constitute a manipulative or deceptive practice within the intendment of § 10(b) and Rule 10b–5. What limited authority there is on the matter is in agreement with this conclusion.[41] *Goodman v. H. Hentz & Co.*, 265 F.Supp. 440, 443–44 (N.D. Ill.1967) (representations that purchases and sales of securities were made when they were not made is actionable under § 10(b) and Rule 10b–5); *Opper v. Hancock Securities Corp.*, 250 F.Supp. 668, 670–73 (S.D.N.Y.), *aff'd* 367 F.2d 157 (2d Cir. 1966) (delay in executing sale is actionable under § 10(b) and Rule 10b–5). *See* Annot., 3 A.L.R.Fed. 819. This holding is also consistent with the fact that a broker-dealer is a fiduciary who owes his customer a high degree of care in transacting his business. *See* Jacobs, The Impact of Securities Exchange Act Rule 10b–5 on Broker-Dealers, 57 Corn.L.Rev. 869, 870–81, 954–57 (1972).[42]

We also believe that Mansbach adequately alleged the requisite scienter, *viz.*, recklessness. While portions of Count I specifically refer to PBT's actions as negligent (see ¶ 14), other portions plainly allege recklessness and gross negligence (see ¶ 27). While these allegations are a bit conclusory as to recklessness, we cannot say, as we would have to in order to approve dismissal of this claim, that it is beyond doubt that Mansbach can prove no set of facts which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *See also Weissbuch v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,

**38.** Our recent decision in *Fryling v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 593 F.2d 736 (6th Cir. 1979), was also a broker-dealer case.

Compare *Toledo Trust Co. v. Nye*, 588 F.2d 202 (6th Cir. 1978), concerning the first factual pattern—trading on the basis of undisclosed material information.

**39.** Note, The Pendulum Swings Farther: The "In Connection With" Requirement and Pretrial Dismissals of Rule 10b–5 Private Claims for Damages, 56 Tex.L.Rev. 62, 71–72 (1977).

See also *Kerbs v. Fall River Industries, Inc.*, 502 F.2d 731, 737 (10th Cir. 1974); *Stevens v. Vowell*, 343 F.2d 374, 378 (10th Cir. 1965); *Boone v. Baugh*, 308 F.2d 711, 713 (8th Cir. 1962).

**40.** The definition of "security" in § 3 of the Securities Exchange Act expressly includes "any . . . warrant or right to subscribe to or purchase, any" "stock." 15 U.S.C. § 78c(a)(10). This clearly includes options to purchase or sell stock. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750–51, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

**41.** While we did not expressly so hold in *Fryling v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 593 F.2d 736 (6th Cir. 1979), that decision is consistent with our holding here. We held in *Fryling*, in pertinent part, that the plaintiff had at best made out a case for negligent action by the broker-dealer, which was insufficient after *Hochfelder*.

**42.** Mansbach has not claimed that PBT did not have a reasonable basis for recommending the Upjohn transactions in the first place. *See* 57 Corn.L.Rev. at 882–905.

558 F.2d 831, 833 (7th Cir. 1977); *Marsh v. Armada Corp.*, 533 F.2d 978, 981 (6th Cir. 1976), *cert. den.* 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803 (1977). The complaint should be particularly entitled to a liberal construction in light of the fact that it was filed before the Supreme Court's decision of *Hochfelder* since it was not until that decision that negligence was conclusively ruled out. Mansbach may have difficulty proving that PBT's actions were reckless, but he has sufficiently alleged it and is entitled to put on his proofs on the question for disposition by the district court by way of summary judgment or trial.

## COUNT II

■■■■ The thrust of Count II of the complaint is that PBT, through its agents and employees Siegel and Tarbis, converted Mansbach's corporate bonds which had been pledged as collateral when PBT refused to return them to Mansbach upon demand. Since Mansbach had fully paid and closed his account with PBT, he contends that PBT converted the bonds in order to try to extract from him a release of PBT from liability. PBT does not contest the allegations of this count insofar as they allege the use of jurisdictional means and causation of damages. PBT's argument is that there was no allegation of implementation of a deceptive or manipulative practice, with the requisite scienter, in connection with the purchase or sale of a security.

PBT contends that while Count II may have made out a common law conversion claim it did not adequately allege of violation of § 10(b) and Rule 10b–5. We agree that a common law conversion claim was stated but disagree that no § 10(b)/Rule 10b–5 claim was stated. This may not be a garden variety conversion case in which the malefactor has wrongfully pocketed the property of the plaintiff but that is not necessary for a common law conversion claim. All that is necessary is that the defendant exercise dominion and control over the property which is inconsistent with

the plaintiff's rights. W. Prosser, Law of Torts § 15 (4th ed. 1971). PBT had no right to retain Mansbach's bonds after he had closed his account and paid it in full. PBT's refusal to return the bonds upon demand constituted an exercise of dominion and control which was inconsistent with Mansbach's ownership rights. If the allegations of the complaint are well founded, PBT may well have had good reason to desire a release from liability, but it could not extract such release by the coercive means chosen.

We believe these allegations also make out a § 10(b)/Rule 10b–5 claim for relief. For the reasons stated earlier,[43] it is appropriate to analogize between the common law and § 10(b) and Rule 10b–5. This weighs in favor of finding that the particular conversion alleged in this case is actionable under § 10(b) and Rule 10b–5.

Further support for such a holding is found in *Superintendent of Insurance v. Bankers Life & Cas. Co.*, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). As we noted above,[44] this case and many others have held that the federal securities laws are to be broadly construed in order to effectuate their underlying purposes. More particularly, the Court made the following remarks:

Likewise irrelevant is the fact that the proceeds of the sale that were due the seller were misappropriated.[7]

[7] *See, e. g., Allico Nat. Corp. v. Amalgamated Meat Cutters & Butcher Workmen of North America*, 397 F.2d 727 (CA7 1968), which held sufficient under § 10(b) and Rule 10b–5 a complaint which charged that defendant union, upon discovering that a third party would pay a higher price, breached a prior agreement to sell 100% of the stock in a wholly owned life insurance company to plaintiffs. The court placed primary reliance on the fact that in the course of the transaction, the union misappropriated some 25,000 shares of the life insurance company's stock which had previously been sold to plaintiffs for cash, but which were being held in escrow pending consummation of the agreement.

"Even if a breach of contract in order to make a more favorable contract would not in

43. See notes 28 31, *supra*, and accompanying text.

44. See notes 32–33, *supra*, and accompanying text.

itself be sufficient [to confer jurisdiction under § 10(b)], we have more here. The motivation not only is said to induce a breach of contract . . . but also to induce the conversion of plaintiffs' pledged 25,000 shares." *Id.*, at 729 730. See also *Cooper v. North Jersey Trust Co.*, 226 F.Supp. 972 (SDNY 1964), in which a conspiracy to loan plaintiff money to buy securities, followed by the misappropriation of the purchased securities when they were pledged to secure the loan, was held to violate § 10(b) and Rule 10b 5.

Indeed, misappropriation is a "garden variety" type of fraud compared to the scheme which gave rise to *A. T. Brod & Co. v. Perlow*, 375 F.2d 393 (CA2 1967). That case involved an action by a broker against its own customers for the recovery of losses suffered when defendant customers refused to pay for securities previously ordered which had decreased in value by the settlement date. The complaint charged that this refusal to honor the purchase order was part of the customers' deceptive plan only to pay for securities purchased for their account when those securities had appreciated in value by the date payment was due.

Rejecting the customers' pleas that "no fraud is alleged as to the investment value of the securities nor any fraud 'usually associated with the sale or purchase of securities,' " *id.*, at 396, the Court of Appeals for the Second Circuit—composed of a different panel from the one sitting in the instant case—reversed the District Court's dismissal of the complaint.

"[We do not] think it sound to dismiss a complaint merely because the alleged scheme does not involve the type of fraud that is 'usually associated with the sale or purchase of securities.' We believe that § 10(b) and Rule 10b 5 prohibit *all* fraudulent schemes in connection and the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws." *Id.*, at 397.

404 U.S. at 10–11 & n. 7, 92 S.Ct. at 168 n. 7.

This language is clearly broad enough to sweep within its reach the allegations of Count II of the complaint. As for scienter, the alleged acts were done knowingly and intentionally, which is sufficient under any conceivable reading of *Hochfelder*.

**45.** The Supreme Court granted certiorari in *Mallis* in order to consider the correctness of the second circuit's ruling that a pledge constitutes a "purchase or sale of securities." Before the Court, however, counsel for respondents changed the theory upon which affirmance was sought, so the Supreme Court dismissed the writ of certiorari as having been improvidently granted. 435 U.S. at 388, 98 S.Ct. 1117.

The principal argument put forth by PBT against the sufficiency of Count II is that the actions alleged were not "in connection with the purchase or sale of securities." In particular, PBT contends that the pledge of the corporate bonds was not a "purchase or sale." We find that these arguments lack merit.

The "in connection with" requirement has easily been met. The Supreme Court has formulated this test very broadly. In *Superintendent of Insurance* it announced that the alleged deceptive practice only need be "touching" the sale of securities. 404 U.S. at 12–13, 92 S.Ct. 165. This has been called a "de minimis 'touch test' " and few cases since *Superintendent of Insurance* have been dismissed for failure to satisfy the "in connection with" requirement of § 10(b) and Rule 10b–5. Note, The Pendulum Swings Farther: The "In Connection With" Requirement and Pretrial Dismissals of Rule 10b–5 Private Claims for Damages, 56 Tex.L.Rev. 62, 66 (1977).

The corporate bonds are also "securities," as that term is employed in § 10(b) and Rule 10b–5. The definition of "security" in § 3 of the Securities Exchange Act expressly includes bonds. 15 U.S.C. § 78c(a)(10).

The most difficult issue presented by Count II is whether the pledge of the securities constituted a "purchase or sale," as those terms are used in § 10(b) and Rule 10b–5. We note a split of authority on the question but we follow those cases holding that a pledge is a "purchase or sale."

The two leading cases on point are *Mallis v. FDIC*, 568 F.2d 824 (2d Cir.), *cert. granted* 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243 (1977), *cert. dismissed* 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978),[45] holding that a pledge is a purchase or sale,[46] and

**46.** *Accord, Kerbs v. Fall River Indus., Inc.*, 502 F.2d 731, 738–39 (10th Cir. 1974); *SEC v. Pig'n Whistle Corp.*, 359 F.Supp. 219, 221 (N.D.Ill. 1973), *aff'd sub nom. SEC v. Dolnick*, 501 F.2d 1279, 1282 (7th Cir. 1974); *American Bank & Trust Co. v. Joste*, 323 F.Supp. 843, 845–46 (W.D.La.1970).

*National Bank of Commerce v. All American Assurance Co.*, 583 F.2d 1295 (5th Cir. 1978), holding that a pledge is not a purchase or sale.[47]

In *Mallis*, the second circuit held that pledgees of stock certificates had standing to sue under § 10(b) and Rule 10b–5. The court found that a pledge came within the definition of "sale" in § 3 of the Securities Exchange Act of 1934: "The terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of." 15 U.S.C. § 78c(a)(14). The court relied upon two prior second circuit cases which held that a pledge came within the similar statutory definition of "sale" in § 2 of the Securities Act of 1933: "The term 'sale' or 'sell' shall include every contract of sale or disposition of a security or interest in a security, for value." 15 U.S.C. § 77b(3). *United States v. Gentile*, 530 F.2d 461 (2d Cir.), *cert. den.* 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976); *SEC v. Guild Films Co.*, 279 F.2d 485 (2d Cir.), *cert. den.* 364 U.S. 819, 81 S.Ct. 52, 5 L.Ed.2d 49 (1960).

In *Gentile*, the court said that a "sale" of a security does not require that title pass since the definition under the Securities Act includes a "disposition" of a security. 530 F.2d at 466. The Securities Exchange Act definition also includes the phrase "dispose of." The court in *Gentile* also reasoned that a pledgee assumes a real investment risk and has a legally enforceable interest in the security. *Id.* at 467. In *Guild Films*, the court noted that a proposal to exempt sales by a holder of pledged securities in order to liquidate the secured debt was rejected by Congress when drafting the Securities Act. 279 F.2d at 489.

The contrary position expressed in *National Bank of Commerce* was that a mere pledge of a security to secure a commercial loan was not a purchase or sale within the intendment of § 10(b) and Rule 10b–5. The court distinguished several cases which involved the actual sale of pledged securities by the pledgee in order to satisfy the se-

cured debt. 583 F.2d at 1299. The court reasoned that the holdings of *Mallis* and *Gentile* may be defensible as a policy matter, but that the Congressional definition of "sale" was binding and it simply did not include a pledge. *Id.* at 1299–1300. The federal securities laws were designed to protect investors, not those engaged in garden variety commercial loan transactions. The ordinary pledgee does not need the protection of the federal securities laws since he can easily sue on the note secured by the pledge. *Id.* at 1300.

The court relied upon its prior decision in *McClure v. First National Bank*, 497 F.2d 490 (5th Cir. 1974), *cert. den.* 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975). The court held in *McClure* that a pledge of securities can constitute a "sale" but generally will not. A commercial bank loan secured by a pledge does not affect the securities industry and is outside the scope of the securities laws.

Of these two lines of cases, we think those from the second circuit are better reasoned and we follow them here. They are sufficient authority to hold that the pledge of Mansbach's bonds to PBT constituted a "purchase or sale of securities." Moreover, this holding is not necessarily inconsistent with the above fifth circuit cases. Those cases were careful to limit their holdings to "mere pledges" of securities to secure a commercial loan. They also emphasized that such a pledge in connection with a bank loan had no impact on the securities industry. In the instant case, however, the pledge was not to a bank, but to a securities broker-dealer, and the pledge was not to secure a loan, but to serve as collateral for securities transactions. Thus, on these facts, even the restrictive fifth circuit cases do not rule out holding that the pledge of securities was a "purchase or sale."

Nothing in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), is contrary to our hold-

---

**47.** *Accord, Reid v. Hughes*, 578 F.2d 634, 638 (5th Cir. 1978); *Herpich v. Wallace*, 430 F.2d 792, 811-12 (5th Cir. 1970).

ing. *See Mallis, supra*, 568 F.2d at 829. In *Blue Chip* the Supreme Court adopted the *Birnbaum*[48] rule which limits standing in § 10(b)/Rule 10b–5 cases to actual purchasers and sellers of securities. The Court was persuaded to adopt the rule because of both its longstanding judicial acceptance in the years since its original enunciation, 421 U.S. at 731–33, 95 S.Ct. 1917, and policy considerations in favor, *id.* at 737–49, 95 S.Ct. 1917. Those policy considerations were that the *Birnbaum* rule banned suits by mere potential purchasers or sellers of securities, which suits would necessarily be largely conjectural and speculative and based upon a hypothetical number of shares. The rule also reduced the number of vexatious lawsuits which would be based almost entirely on oral proof. The pledge at issue in this and like cases, contrariwise, is a single concrete event, involves a limited class of persons and a specific amount of securities, and is supported by written documentation, and this lawsuit prays for a precise amount of damages. *Blue Chip* does not counsel against holding that a pledge is a "purchase or sale" of a security.

## ARBITRATION

 The district court, after dismissing the federal claims in Mansbach's complaint, stayed action on all other aspects of the case pending arbitration. Since we have ruled that the court erred in dismissing the federal claims, the question of arbitration is now in a new posture.[49]

As to the federal claims, the teaching of *Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), precludes compelling Mansbach to submit the matter to arbitration. The arbitration agreement is overridden by the anti-waiver provisions of the federal securities laws. While *Wilko* arose under only the Securities Act of 1933, its holding and rationale are equally applicable to cases arising under the Securities Exchange Act of 1934. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Moore*, 590 F.2d 823, 827–29 (10th Cir. 1978); *Weissbuch v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 558 F.2d 831, 834–35 (7th Cir. 1977); *Ayres v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 538 F.2d 532, 536 (3d Cir.), *cert. den.* 429 U.S. 1010, 97 S.Ct. 542, 50 L.Ed.2d 619 (1976); *Newman v. Shearson, Hammill & Co.*, 383 F.Supp. 265, 268 (W.D.Tex.1974); *Maheu v. Reynolds & Co.*, 282 F.Supp. 423, 426 (S.D.N.Y.1967); *Stockwell v. Reynolds & Co.*, 252 F.Supp. 215, 220 n. 2 (S.D.N.Y. 1965). This case does not come within the narrow exception to *Wilko* for cases concerning international securities transactions established in *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). *See Merrill Lynch, supra*, 590 F.2d at 827–29; *Weissbuch, supra*, 558 F.2d at 834; *Ayres, supra*, 538 F.2d at 536–37.

*Wilko*, however, only precludes forcing Mansbach to arbitrate the federal aspects of his complaint; it is inapplicable to those portions of the complaint based upon state law and in federal court by reason of diversity of citizenship jurisdiction. As a practical matter, though, both the federal and state claims arise out of the same facts and it would be duplicative, at best, for these same facts to be the subject of two simultaneous hearings.[50] At worst, the two proceedings could produce inconsistent results.

In order to avoid this problem, on remand the district court should employ one of the two following courses of action. If the district court determines that as to either Count I or II of the complaint the federal claims contain substantially the same elements as the state law claims, so that resolution of the federal claims will necessarily resolve the state claims, then the court should consolidate the federal and state

---

**48.** *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), *cert. den.* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952).

 *See also Gaudin v. KDI Corp.*, 576 F.2d 708 (6th Cir. 1978); *Marsh v. Armada Corp., supra*, 533 F.2d 978.

**49.** We find no merit in Mansbach's contention that the arbitration agreement was unenforceable as "unconscionable."

**50.** We were informed by counsel at oral argument that arbitration proceedings have not yet been commenced.

claims as to either or both counts and not refer such counts to arbitration.[51]

In the alternative, if the federal and state claims are deemed not similar enough for such consolidation, or if the federal claims are resolved before trial, then the district court should proceed only on the federal claims and stay all proceedings on the state claims pending resolution of the federal claims.[52] If Mansbach is unsuccessful on the federal claims, the district court should then refer the state claims to arbitration. We believe that principles of collateral estoppel would prevent Mansbach from relitigating issues decided in the federal proceeding, *see New York State Association for Retarded Children v. Carey*, 456 F.Supp. 85, 96 (E.D.N.Y.1978), so that Mansbach will not get two bites at the apple. Only if Mansbach loses on the federal claims on some element unique to the federal claims could an arbitration yield a different result.

## OTHER ISSUES

Our disposition of this case makes it unnecessary for us to decide whether Mansbach has a private implied claim for relief under either the NASD or options exchange rules. We also express no opinion on the state law claims and the allegations of Court III inasmuch as the district court did not reach these matters. We also are not asked to rule on the asserted liability of PBT for the actions of its agents and employees not joined as defendants.[53]

The judgment of the district court is reversed and the cause is remanded for further proceedings consistent with this opinion.

---

**51.** The federal and state claims will obviously not be identical. For example, the federal claims require proof of the federal jurisdictional elements and proof of at least recklessness, while the state claims would have no such jurisdictional test and could require different, even varying scienter. Such differences should be regarded as insubstantial. We leave to the district court's discretion the overall question of whether the federal and state claims are substantially the same.

**52.** This procedure was apparently employed by the district court in *Weissbuch, supra*, 558 F.2d at 831, and approved by the seventh circuit. It was also employed in *Stockwell v. Reynolds & Co.*, 252 F.Supp. 215, 220 (S.D.N.Y.1965).

**53.** *Cf. Holloway v. Howerdd*, 536 F.2d 690 (6th Cir. 1976).