In re: KEITHLEY INSTRUMENTS, INC. SECURITIES LITIGATION

No. 1:01–CV–0715.

United States District Court, N.D. Ohio, Eastern Division.

Sept. 30, 2002.

Barbara A. Podell, Savett Frutkin Podell & Ryan, P.C., Philadelphia, PA, Daniel P. Goetz, Weisman, Kennedy & Berris, Cleveland, OH, Kim E. Levy, Milberg Weiss Bershad Hynes & Lerach, New York City, R. Eric Kennedy, Weisman, Kennedy & Berris, Cleveland, OH, Robert P. Frutkin, Savett Frutkin Podell & Ryan, P.C., Philadelphia, PA, William C. Fredericks, Milberg Weiss Bershad Hynes & Lerach, Samuel H. Rudman, Milberg Weiss Bershad Hynes & Lerach, Steven G. Schulman, Milberg Weiss Bershad Hynes & Lerach, New York City, for Gerry L. Albertson, Lead Plaintiff, on behalf of himself and all others similarly situated, Bob Banjac, Lead Plaintiff, on behalf of himself and all others similarly situated, Plaintiffs.

Carl Volz, Katten Muchin Zavis, Chicago, IL, Daniel P. Mascaro, Progressive Corporation, Mayfield Village, OH, David H. Kistenbroker, Katten Muchin Zavis Rosenman, Chicago, IL, James R. Wooley, Baker & Hostetler, Cleveland, OH, Leah J. Domitrovic, Katten Muchin Zavis Rosenman, Chicago, IL, Rebecca C. Lutzko, Baker & Hostetler, Cleveland, OH, Theresa L. Davis, Katten Muchin Zavis, Chica-

go, IL, for Keithley Instruments, Inc., Joseph P. Keithley, Defendants.

## MEMORANDUM & ORDER

O'MALLEY, District Judge.

In a consolidated amended complaint, several plaintiff shareholders ("Shareholders") bring a putative class action lawsuit against defendants Keithley Instruments, Inc., and its president, Joseph Keithley (referred to collectively below as "Keithley," except where noted),[1] for securities fraud. Specifically, the Shareholders allege that Keithley "disseminat[ed] ... false and misleading statements concerning the Company's business condition and prospects for ... the three months ending March 31, 2001." Complaint at ¶ 1. The alleged purpose of this scheme was to artificially inflate the price of Keithley's stock, allowing certain insiders to profit by selling the stock at the inflated price. The Shareholders claim that Keithley violated § 10(b) and § 20(a) of the Securities and Exchange Act of 1934, as well as Rule 10b–5 (17 C.F.R. § 240.10b–5) promulgated thereunder.

Keithley moves to dismiss the Shareholder's consolidated amended complaint (docket no. 18), contending the Shareholders have not satisfied Fed.R.Civ.P. 12(b)(6) and 9(b), nor the heightened pleading requirements set out in the Private Securities Litigation Reform Act ("PSLRA"), Pub.L. No. 104–67, 109 Stat. 737 (codified in various sections of 15 U.S.C. §§ 77a et seq. and §§ 78a et seq.). The Court held a hearing on this motion on November 30, 2001. Having considered the parties' written briefs and the points raised at oral argument, and for the reasons stated below, the motion is **GRANTED** and this case is **DISMISSED**.

### I. The Complaint.

The Shareholders make the following allegations in their complaint. On February 8, 2001, Keithley had over 13 million shares of common stock trading on the New York Stock Exchange under the symbol "KEI." The Shareholders bring this action on behalf of all persons who acquired Keithley stock between January 18 and March 9, 2001. The allegations in the Shareholders' complaint are made

> upon information and belief (except as to allegations specifically pertaining to plaintiffs and their counsel, which are based on personal knowledge) based upon the through investigation, conducted by and under the supervision of plaintiffs' counsel, which included obtaining, reviewing and analyzing all reasonably available sources of information relating to the relevant time period, including, inter alia, SEC filings, publicly available annual reports, press releases, news articles and other media reports (whether disseminated in print or by electronic media), and reports of securities analysts and investor advisory services, in order to obtain the information necessary to plead plaintiffs' claims with particularity.

Complaint at 1.

Keithley is in the business of manufacturing sophisticated electronic testing and measurement equipment. This equipment is designed to provide highly accurate data regarding low levels of voltage, resistance, current, capacitance, and charge in diodes, transistors, resistors, capacitors, sensors, and full electronic systems. Keithley products are used primarily by the telecommunications, semiconductor, optoelectronics, and other high-tech industries to

---

1. The amended complaint also originally named as a defendant Keithley's Senior Vice President, Gabriel Rosica. The Court earlier granted a stipulated motion to dismiss Rosica as a defendant, without prejudice. See docket nos. 31 & 32 (granting the motion to dismiss Rosica (docket no. 23)).

design, test and manufacture their own products. The price of a single Keithley instrument varies from about $1,000 to hundreds of thousands of dollars.

During the class period, Keithley made a number of public statements that the Shareholders allege were knowing, material misstatements. The first of these occurred on January 18, 2001, in a Keithley press release. This press release first assessed the company's results from the prior quarter, stating it had achieved "record sales, earnings, orders, and backlog," representing "the eighth consecutive quarter of record pretax earnings." First Press Release at 1.[2] The press release quoted Mr. Keithley as stating:

> Orders, sales and earnings all continued to grow to record levels .... We continue to gain market share because of our wealth of applications knowledge and technology leadership, and believe our key industries offer very good long-term potential for Keithley. We also continue to be pleased with customer acceptance of our new semiconductor characterization system introduced last summer. New products will remain a critical element in our success.

*Id.* The press release then looked to the current quarter—that is, the three months ending March 31, 2001—and beyond, stating, among other things:

> — Quarter to quarter results will always be order dependent, but our record backlog along with current business activities lead us to believe that sales and pretax earnings of the second quarter will exceed those of the first quarter.
> — The company is estimating sales growth for fiscal 2001 in excess of 25 percent over fiscal year 2000 sales of $151 million based on continued growth in the optoelectronics, semiconductor and telecommunications industries.

*Id.* at 2. The press release added, however, that all of the comments quoted above "are forward-looking statements that involve a number of risks and uncertainties." The press release explained:

> Actual results may differ materially from the expected results stated or implied in the forward-looking statements as a result of a number of factors .... * * * In light of these uncertainties, the inclusion of forward-looking information should not be regarded as a representation by the company that its plans or objectives will be achieved.

*Id.* at 2.

Following this press release, at least two stock analysts issued favorable reports about Keithley. Thomas Weisel Partners LLC reiterated a BUY rating, and Pacific Growth Equities reiterated a STRONG BUY rating. In their reports, the stock analysts essentially stated that, having spoken with company representatives, they believed Keithley's assertions that the company's sales, earnings, and market share would continue to increase. By the end of that day, Keithley's stock price had moved from $52.25 to $59.81, a 14.5% increase.

Shortly thereafter, despite these analysts' "buy" recommendations, Mr. Keithley sold a number of his Keithley shares. Specifically, Mr. Keithley sold 41,500 Class A shares on January 22, 2001 at $59.03 per share and 13,030 "Class B" shares on January 30, 2001 at $67.31 per share, resulting in total proceeds of about $3.3 million. During the same time frame—that is, within days of the January 18, 2001 Press Release and the resulting stock price increase—five other Keithley insiders sold a total of 84,000 shares of Keithley stock, at prices ranging from $58.00 to $68.03 per share, for a total of over $5 million.

2. The Court's citation refers to Appendix E to Keithley's motion to dismiss.

The second alleged misstatement to which the Shareholders point was another press release, this one on February 13, 2001. In this press release, Keithley "reaffirm[ed] the guidance given in its January 18, 2001 release." Second Press Release at 1.[3] Keithley again stated:

— Quarter to quarter results will always be order dependent, but our record backlog along with current business activities lead us to believe that sales and pretax earnings for the second quarter will exceed those of the first quarter.

— The company is estimating sales growth for fiscal 2001 in excess of 25 percent over fiscal year 2000 sales of $151 million based on continued growth in its businesses serving the optoelectronics, semiconductor and telecommunications industries.

*Id.* Furthermore, Mr. Keithley was quoted as saying:

We believe we are still on track for the second quarter and the fiscal year, but are beginning to see some softening in order rates, particularly in our semiconductor business. Based upon the current U.S. economy, we are seeing some of our customers become more cautious. However, we are encouraged by potential orders in the pipeline, and by new product introductions planned over the next several quarters. We continue to see very good opportunities especially for our optoelectronics business.

*Id.* The press release again concluded with the same explanation about "forward-looking statements" quoted above.

The third alleged misstatement came the next day, in the form of Keithley's SEC Form 10–Q for the first quarter of 2001. In the Form 10–Q, Keithley reiterated the statements contained in the two press releases about the current quarter:

— Quarter to quarter results will always be order dependent, but our record backlog along with current business activities lead us to believe that sales and pretax earnings for the second quarter will exceed those of the first quarter.

— The company is estimating sales growth for fiscal 2001 in excess of 25 percent over fiscal year 2000 sales of $151,561[,000] based on continued growth in the optoelectronics, semiconductor and telecommunications businesses.

Form 10–Q at 10. Keithley also stated:

As of the date of this filing, the company has begun to see some softening in order rates, particularly in its semiconductor business. Based on the current U.S. economy, some of its customers are becoming more cautious with their capital expansion plans. However, management is encouraged by potential orders in the pipeline, and by new product introductions planned over the next several quarters, and continues to see very good opportunities especially for its optoelectronics business.

*Id.* at 11. Once again, however, Keithley added cautionary language: the above-quoted assessments "constitute forward-looking statements, as that term is defined in the [PSLRA]. Such statements are subject to certain risks and uncertainties that could cause actual results to differ materially from those projected." *Id.* Following this second press release and Form 10–Q publication, at least two stock analysts again issued favorable reports about Keithley. In their reports, the stock analysts essentially stated that, in light of Keithley's most recent assertions, they believed their "prior guidance" remained accurate. Thomas Weisel Partners LLC maintained its favorable outlook, and Jessup & Lamont reiterated a STRONG BUY

---

**3.** The Court's citation refers to Appendix F to Keithley's motion to dismiss.

rating, with a "12–month price target" of $110.

The Shareholders assert Keithley's positive statements were misleading and fraudulent because, at the time it made those statements, Keithley knew it was experiencing a host of serious problems. *See* Complaint at ¶ 42(a-i). Specifically, the Shareholders allege that Keithley knew it had the following problems with its product line:

- Keithley's # 1700 and # 1800 products did not meet specifications because they did not reach stated speeds; despite this problem, Keithley decided to simply ship the defective products and deal with customer complaints "on an individual basis."

- a number of distributors asked Keithley to take back millions of dollars worth of laptop products because of certain problems, "including a large number of returns from markets in Asia."

- Keithley's # 2400 product line—which was one of the company's largest in terms of both product units and sales revenue—suffered calibration and manufacturing defects. The Shareholders note that this was "a major product for Keithley because Agilent—Keithley's primary competitor—had not yet produced a competing product."

- Keithley's # 2000 product line suffered from production problems leading to an internal quality control failure rate as high as 75%.

The Shareholders also make other allegations about problems they claim Keithley was having, including "moving from a culture of ensuring quality to one willing to cut comers," providing large numbers of new employees with inadequate training, shipping product that was returned because it caught fire, and losing business to competitors. The Shareholders also assert that, in late January or early February, Mr. Keithley "informed an internal meeting of Keithley personnel that orders were 'slowing down' and that customers had 'stopped buying,'" and "instructed each department to meet and decide the methods by which spending could be cut back." At about the same time, a former employee working in "the emerging applications unit" was allegedly informed that the company was "cutting funding for new products." The Shareholders allege that, in light of these "known problems," especially the cancelled orders and product returns, Keithley could not really believe its "record backlog" would lead to "sales and pretax earnings for the second quarter [that] will exceed those of the first quarter."

Finally, the Shareholders point to a third Keithley press release, this one on March 12, 2001, at which time "the truth finally emerge[d]." This press release disclosed that Keithley's second quarter 2001 sales and orders would *not*, in fact, be higher than first quarter. Specifically, the March 12, 2001 press release stated that Keithley expected second quarter 2001 sales would total $40–43 million, compared to first quarter sales of $44.5 million; and second quarter orders would be "25% lower" than first quarter orders of $49.8 million. The March 12, 2001 press release also indicated that, while second quarter 2001 earnings still would likely exceed first quarter earnings, they would be "lower than previously projected."[4] Keithley attributed these results to its customers' reduction of new equipment orders, its customers' delaying delivery schedules of sold product, and outright order cancellations by semiconductor customers. Keithley's

---

4. Keithley also still expected its 2001 *annual* sales to be higher than 2000 annual sales, though it reduced its expectation from the "25% higher" prediction in its earlier press releases to an estimate of 5–10% higher than the prior year.

stock price had, by this time, fallen with the general stock market, but it declined further after the third press release. On March 9, 2001, the trading day before the third press release was issued, Keithley stock closed at $20.76; after the press release issued, the stock dropped to a closing price of $14.95—a one-day decline of 28%. The first of the consolidated complaints in this case was filed two weeks later.

## II. Motion to Dismiss Standard for Securities Fraud Complaints.

■ In deciding a motion to dismiss under Rule 12(b)(6), the Court must take all well-pleaded allegations in the complaint as true and construe those allegations in a light most favorable to the plaintiff. *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 325, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991); *Dana Corp. v. Blue Cross & Blue Shield Mut.*, 900 F.2d 882 (6th Cir.1990); *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 489 (6th Cir.1990). However, the Court need not accept as true a legal conclusion couched as a factual allegation. *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). A well-pleaded allegation is one that alleges specific facts and does not merely rely upon conclusory statements. In the context of a motion to dismiss a securities fraud claim, a court "may consider the full texts of the SEC filings, prospectus, analyst's reports and statements 'integral to the complaint,' even if not attached, without converting the motion into one for summary judgment under Rule 56." *In re Royal Appliance Securities Litigation*, 64 F.3d 663, 1995 WL 490131, at *2 (6th Cir.1995). In addition, the Court may consider documents to which the plaintiffs refer in their complaint, even if the plaintiffs do not attach them as exhibits, as long as these documents are central to plaintiffs' claims. Similarly, the Court may consider public records and matters of which a court may

take judicial notice without converting the motion to dismiss into a motion for summary judgment. *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir.1997); *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir.1999)

In 1995, Congress passed the PSLRA, which heightened the pleading standard in securities litigation. The PSLRA requires a plaintiff to state with particularity all facts supporting an allegation made on information and belief, and all facts establishing scienter. Section 78u–4(b) states:

**(b) Requirements for securities fraud actions**

**(1) Misleading statements and omissions**

In any private action arising under this chapter in which the plaintiff alleges that the defendant—

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

**(2) Required state of mind**

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong

inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(1) & (2).[5]

The Sixth Circuit, in *In re Comshare, Inc. Securities Litigation*, 183 F.3d 542 (6th Cir.1999), held that plaintiffs may meet PSLRA pleading requirements "by alleging facts that give rise to a strong inference of reckless behavior but not by alleging facts that illustrate nothing more than a defendant's motive and opportunity to commit fraud." *Id.* at 551. The Court in *Comshare* defined recklessness as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger may not be known, it must at least be so obvious that any reasonable man would have known of it." *Id.* at 550 (citing *Mansbach v. Prescott*, 598 F.2d 1017, 1025 (6th Cir. 1979)). Recklessness is to be understood as a "mental state apart from negligence and akin to conscious disregard." *Id.*

The *Comshare* court, in explaining the role that allegations of motive and opportunity play in the assessment of scienter, explained:

> [W]e cannot agree that under the PSLRA, plaintiffs may establish a "strong inference" of scienter merely by alleging facts demonstrating motive and opportunity where those facts do not simultaneously establish that the defendant acted recklessly or knowingly, or with the requisite state of mind. While facts regarding motive and opportunity may be "relevant to pleading circum-

stances from which a strong inference of fraudulent scienter may be inferred" and may, on occasion, rise to the level of creating a strong inference of reckless or knowing conduct, the bare pleading of motive and opportunity does not, standing alone, constitute the pleading of a strong inference of scienter.

*Id.* at 551 (footnote and citation omitted). In *Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir.2001) (en banc), *cert. denied*, 536 U.S. 935, 122 S.Ct. 2616, 153 L.Ed.2d 800 (2002), the Sixth Circuit expanded upon the interplay of motive, opportunity, and scienter:

> While it is true that motive and opportunity are not substitutes for a showing of recklessness, they can be catalysts to fraud and so serve as external markers to the required state of mind. *Comshare* made this distinction clear by refusing to equate motive and opportunity with scienter but yet recognizing that facts showing each may support a strong inference of recklessness. We reaffirm that plaintiffs cannot simply plead "motive and opportunity" as a mantra for recovery under the Reform Act.

*Id.* at 550. *Helwig* cautioned courts to focus on the particular facts of the case before them and not simply look to the labels that the parties place on them. *Id.* at 550–51. "Accordingly, facts presenting motive and opportunity may be of enough weight to state a claim under the PSLRA, whereas pleading conclusory labels of mo-

---

**5.** The Sixth Circuit Court of Appeals has explained the particularity requirement embodied in 15 U.S.C. § 78u–4(b)(2) and Fed. R.Civ.P. 9(b) as follows:

> In the context of securities litigation it has generally been held that Rule 9(b) serves three purposes: (1) it ensures that allegations are specific enough to inform a defendant of the act of which the plaintiff complains, and to enable him to prepare an effective response and defense; (2) it elimi-

nates those complaints filed as a pretext for the discovery of unknown wrongs—a 9(b) claimant must know what his claim is when he files; and (3) it seeks to protect defendant from unfounded charges of wrongdoing which injure their reputations and goodwill.

*Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 361–62 (6th Cir.2001) (internal quotation marks and citations omitted).

tive and opportunity will not suffice." *Id.* at 551 (citing *Comshare,* 183 F.3d at 551).

The court in *Helwig* found this fact-specific approach best reflected the intent of Congress. *See Helwig,* 251 F.3d at 551 (citing *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 196 (1st Cir.1999)) ("whatever the characteristic patterns of the facts alleged, those facts must now present a strong inference of scienter"). Thus, in order to determine whether a plaintiff has adequately pled scienter under the PSLRA, the Court must assess whether the allegations in the complaint, taken as a whole, including those relating to motive and opportunity, give rise to a strong inference of recklessness on the part of the defendants. While recognizing such a fact-specific inquiry does not lend itself to rigid formulae for determining when a plaintiff has sufficiently alleged scienter, the Sixth Circuit did indicate several factors that are usually relevant to this inquiry:

(1) insider trading at a suspicious time or in an unusual amount;

(2) divergence between internal reports and external statements on the same subject;

(3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

(4) evidence of bribery by a top company official;

(5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;

(6) disregard of the most current factual information before making statements;

(7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

(8) the personal interest of certain directors in not informing the disinterested directors of an impending sale of stock; and

(9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Id.* at 552 (citing *Greebel,* 194 F.3d at 196). The *Helwig* court emphasized, however, that this list was not exhaustive, and was only meant to "point to fixed constellations of facts that courts have found probative of securities fraud." *Id.* at 552.

In adopting this standard, the Sixth Circuit expressly rejected the views of those courts with both broader and narrower views of the PSLRA. Thus, in *Comshare* and again in its decision in *Helwig,* the Sixth Circuit rejected the view espoused by a number of courts, including the Second Circuit, that the PSLRA simply requires a plaintiff to either: (1) allege facts constituting strong circumstantial evidence of conscious or reckless behavior; or (2) allege facts showing a defendant's motive and opportunity to commit fraud. *Comshare,* 183 F.3d at 549. And, the court in *Comshare* rejected the view, espoused by the district court in that case, that a plaintiff must allege facts indicating a knowing misrepresentation or conscious intent to defraud before a complaint can pass muster under the PSLRA. *Id.* at 551–52.

Instead, after a careful analysis of the plain language of the PSLRA, the *Comshare* court concluded that, while a plaintiff may state a valid claim under the PSLRA premised on recklessness alone (as distinct from knowing misconduct), the facts alleged collectively must give rise to a "strong inference" that the defendants did, indeed, behave recklessly. *Helwig* reaffirms this approach. Thus, the Sixth Circuit employs a form of "totality of the circumstances" analysis; this Court, accordingly, must not examine the Shareholders' allegations in piecemeal fashion

and will, instead, assess them collectively to determine what inferences may be drawn therefrom.

### III. Analysis.

#### A. Section 10(b) and Rule 10b–5.

To state a claim under § 10(b) of the Securities and Exchange Act of 1934, and Rule 10b–5, a plaintiff must allege in connection with the purchase or sale of securities the following elements: (1) a misrepresentation or omission, (2) of a material fact, (3) made with scienter, (4) upon which the plaintiff relied, and (5) which proximately caused the plaintiff's injury. *Comshare*, 183 F.3d at 548. Keithley's motion for dismissal of the Complaint focuses on the first, third, and fifth elements.

With regard to proximate cause, Keithley argues the Shareholders have inadequately pleaded their losses were caused by Keithley's conduct, as opposed to the general stock market decline. In particular, stock market records show that the closing price of Keithley on January 17, 2001—the day before the First Press Release—was $52.25. It then rose to an intra-day high of $69.55 on January 30, 2001, an upward trend that was seen throughout the stock market—the day after the January 18, 2001 press release, while Keithley's stock price rose, so did that of Agilent (Keithley's primary competitor), and so did the NASDAQ composite and the Dow Jones Semiconductor Index. During the remainder of the class period, however, the stock price trended

downward with the rest of the stock market, so that, on February 15, 2001—the day *after* the allegedly false Second Press Release (allegedly designed to inflate Keithley's stock price)—the stock closed at $39.25, about 44% off its class period high. The stock continued to follow the overall market trend downward, so that, on March 9, 2001—the trading day *before* the Shareholders assert the "truth emerged" via Keithley's Third Press Release—the stock closed at $20.76, about 70% off its class period high. Thus, the vast majority of the decrease in Keithley's stock price during the class period *predated* the alleged "revelation" that Keithley's earlier statements were fraudulently optimistic. Keithley asserts that the actual explanation for this price decline is simply broad market forces, as evidenced by the following statistics: (1) the stock price of Agilent (Keithley's primary competitor) during this same time frame dropped from an intra-day high of $68.00 on January 18, 2001 to a closing price of $37.05 on March 9, 2001, a decline of about 45%; (2) the NASDAQ composite dropped from an intra-day high of 2892.36 on January 24, 2001 to a close of 2052.78 on March 9, 2001, a decline of about 29%; and (3) the Dow Jones Semiconductor Index dropped from an intra-day high of 2154.88 on January 24, 2001 to a close of 1560.99 on March 9, 2001, a decline of about 28%.[6]

Turning to scienter—the third element of a ¶ 10(b) claim—Keithley argues that the complaint is so lacking in particularity

---

**6.** The Court takes judicial notice of these stock prices and market indices. Although the Shareholders object to Keithley's reference to this data because it is not explicitly alleged nor included as an appendices to the complaint, "the district court may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment" in a securities fraud case. *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 166 n. 8 (2nd Cir.2000).

"In securities fraud actions, courts will also 'examine the other information that was publicly available to reasonable investors at the time the defendant made statements plaintiffs alleged were fraudulent,' including documents or articles cited in the complaint, SEC filings, press releases, stock price tables, and other material on which plaintiff's allegations necessarily rely." *In re First Union Corp. Sec. Litig.*, 128 F.Supp.2d 871, 883 (W.D.N.C. 2001) (citing cases).

that the scienter allegations are legally inadequate. Specifically, as discussed below in more detail, Keithley asserts that the complaint "fails to state with particularity facts giving rise to a strong inference that the defendant[s] acted" with either an intent to deceive or recklessness. 15 U.S.C. § 78u–4(b)(2). Keithley claims that the Shareholders' allegations are vague conclusory, and primarily premised on counsel's "information and belief," all of which, Keithley asserts, render them inadequate under the stringent pleading requirements of the PSLRA.

Finally, with regard to the alleged misrepresentations, Keithley presents three separate arguments. First, Keithley insists that the amended complaint does not allege with sufficient particularity the details of the supposed scheme, including why or how the alleged misrepresentations were false. Second, Keithley asserts that at least some of the alleged misrepresentations (e.g., stock analyst statements) were neither made by Keithley, nor can be attributed to it. Thus, to the extent the securities fraud claims rely on statements by stock analysts, Keithley has no liability. And third, Keithley states that the "misrepresentations" to which the Shareholders point were actually forward-looking statements that are not actionable under the PSLRA, and/or were immaterial.

The Court finds that at least two of Keithley's arguments are well-taken. Specifically, the Court finds that: (1) the complaint does not allege facts with particularity which give rise to a strong inference of scienter; (2) the alleged misrepresentations were either (a) forward-looking statements that are not actionable under the PSLRA, or (b) not attributable to Keithley. Because these two conclusions each provide sufficient grounds for dismissal of

the complaint, the Court does not reach Keithley's other arguments.[7]

### 1. Scienter.

Scienter generally refers to a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). While Keithley contends that the complaint insufficiently pleads scienter, the Shareholders argue that their complaint gives rise to a strong inference of scienter through the combination of: (1) its allegations showing a divergence between, on the one hand, Mr. Keithley's internal statements and the company's "known operational problems," and, on the other hand, the company's reports and statements made to the public; and (2) its allegations regarding Keithley's motive and opportunity to defraud. Each is discussed below.

### a. The Company's Condition.

■ As noted above, if a plaintiff asserts a securities claim, as the Shareholders do here, grounded on misrepresentations by the defendants, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state *with particularity* all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1) (emphasis added). This threshold pleading requirement is mandatory; if the pleading requirements are not met, the Court "shall" dismiss the complaint. *Id.* at § 78u–4(b)(3)(A). In this case, the Shareholders have not pleaded with the requisite level of particularity.

The essence of the Shareholders' claim is that Keithley knew of (or recklessly

7. The Court notes, however, that many of Keithley's other contentions appear to have

merit, either in whole or in part.

ignored) evidence that its business had serious problems, to the point that it could not reasonably believe its own public statements about the Company's prospects. The Shareholders assert that they and their counsel conducted an investigation that provided them with information sufficient to support a belief that Keithley's actions were at least reckless, if not knowing misrepresentations. The allegations of the complaint, however, are vague and conclusory.

The Court's characterization of the allegations as "vague" is best borne out by the complaint at ¶ 42(a-i). The Court does not reiterate these allegations here in their entirety, but it is in ¶ 42 that the Shareholders list the allegedly serious business problems they claim Keithley knew it had, but failed timely to disclose. In other words, it is primarily to ¶ 42 that the PSLRA pleading requirements apply.

One indicator of the vagueness of these allegations is the consistent use of passive voice—e.g., "Keithley's customers *were reducing* new equipment orders"—thereby subtly avoiding identification of *who* the actors were or when it became apparent that orders were, in fact, declining. Other allegations are not so subtle in avoiding disclosure of identity. For example, in their allegation that, "according to another former Keithley employee, the emerging applications unit at Keithley was informed in January or early February that the Company was cutting funding for new products," the Shareholders carefully avoid identifying both who supplied this information *and* who heard it.

Some courts insist that plaintiffs plead the *actual identity* of sources who provid-

ed the plaintiffs with the information upon which their beliefs of misrepresentation are based, while other courts are satisfied with more general descriptions of the bases for a plaintiff's asserted "beliefs." Compare *In re Nice Systems, Ltd. Sec. Litig.*, 135 F.Supp.2d 551, 570 n. 12 (D.N.J. 2001) ("the PSLRA dictates that plaintiffs pleading on information and belief set forth each and every event or circumstance upon which their claims are based," including "the names of confidential informants, employees, competitors and others who provide information which leads to the filing of a complaint") with *Novak v. Kasaks*, 216 F.3d 300, 314 (2nd Cir.2000), *cert. denied*, 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000) ("where plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false"); *see also Lirette v. Shiva*, 27 F.Supp.2d 268, 275 (D.Mass.1998) ("[p]leadings based on information and belief, without specifying the source of the information and the reasons for the belief, do not pass muster"). While this Court is inclined to believe that a rule requiring the actual identity of sources is too stringent, even those courts who employ more lenient standards look for descriptions "in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314. Here, the Shareholders identify their sources merely as "former employees," without even hinting whether they are managers, secretaries, or production line workers.[8] Furthermore, in almost every

---

8. The Shareholders allege they know of the problems described in ¶¶ 42(g) and 42(i) by virtue of reports from "former employees," but give absolutely no identifying information. As for the remaining subparts of ¶ 42, no mention is made of how the Shareholders learned of the problems described. At oral argument, counsel for the Shareholders asserted that all of the subparts of ¶ 42 are gleaned from discussions with former employees, even though only subparts (g) and (i)

instance, the Shareholders leave completely unidentified the customers and distributors who had the alleged problems with Keithley products, as well as the Keithley employees knowledgeable about the alleged problems (e.g., the employee[s] who "decided to ship defective products," or who worked in internal quality control and "failed" 75% of the # 2000 product line).

In addition to failing to allege sufficiently "who" provided information supporting their beliefs that Keithley engaged in misrepresentations, the Shareholders also fail sufficiently to allege other important "what/where/when/how" details. For example, a former Keithley employee was allegedly told by someone that the company was "cutting funding" to a department, but what this means is left entirely unexplained—the company's knowledge of an imminent 50% cut might have meaning, while a distant 5% cut might not, yet this critical particular is not mentioned. Similarly, the allegation that unknown employees believe Keithley hired a large number of new employees but did not give them "proper training" presents disgruntled opinion more than any fact stated with particularity. Other allegations also suffer from ambiguity and lack of detail: to show that Keithley "moved away from a culture of ensuring quality to one willing to cut corners," the Shareholders allege, inter alia, that "documents were not being retained as required and process steps and feedback procedures were being ignored," a statement remarkable for its lack of specificity. Regarding Mr. Keithley's alleged explicit statements to employees that

orders were "slowing down," customers had "stopped buying," and various departments should decide how "spending could be cut back," it is unclear whether these statements were made weeks or only hours before Mr. Keithley stated publically, on February 13, 2001, that the company was "beginning to see some softening in order rates." [9]

The Shareholders do provide some detail in ¶ 42(h) regarding loss of sales ("in the 2Q 2001 Keithley lost a significant order from American Power Conversion ... which typically did $200,000 in business per quarter ... and the order was instead awarded to a competitor"), but this allegation still lacks critical context (e.g., what percentage of anticipated business did the lost sale represent? when did the loss occur? and so on) and is most notable for the degree to which it highlights the *lack* of detail in the other allegations. Even with regard to the alleged problems identified with various Keithley product lines, the individual and cumulative import of these problems on Company results is suggested in a wholly conclusory fashion. In other words, there are no particularized allegations explaining *how* or *to what degree* any of the alleged problems at Keithley caused a decrease in sales or earnings.

Put simply, although ¶ 42 is the centerpiece of the scienter element of the Shareholders' claims, the allegations are largely lacking in "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990). In a case

---

explicitly so allege. Hearing tr. at 44. Even accepting counsel's representation, the lack of particulars remains.

9. Counsel for the Shareholders stated at oral argument that Mr. Keithley "instructed the departments to discuss potential methods for *immediate* cutbacks," but the complaint does not make this allegation. Hearing tr. at 49

(emphasis added). There is also no information from which the context of Mr. Keithley's alleged statement can be assessed; for example, was the statement made in the context of a general pitch to employees to control expenditures in light of the worsening economy, or was it directed to a specific cash-flow concern?

where "[t]he Plaintiffs overarching theory is that the Defendants made projections that they knew could not be fulfilled in light of internal information they had which not only suggested but made it clear that their expansion plans, earnings estimates, and other predictions were unattainable," the securities fraud claim must be dismissed when the *particulars* of "what the defendants knew" are not alleged. *Bryant v. Avado Brands, Inc.*, 100 F.Supp.2d 1368, 1380 (M.D.Ga.2000), *reversed on other grounds sub nom Bryant v. Dupree*, 252 F.3d 1161 (11th Cir.2001). Without these details, the Shareholders do not adequately state a claim under the PSLRA. *See also Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 550 (8th Cir.1997) ("Plaintiffs fail to identity the goods and services allegedly purchased and sold by Gateway at deflated and inflated prices. The Plaintiffs fail to allege the amount of fraudulent profit allegedly obtained by Gateway. Although the Plaintiffs declare that a total of $10,000,000 in goods and services were bought and sold, the Plaintiffs fail to provide the source for the gross amounts they allege. The Plaintiffs provide the barest clue as to when the alleged fraud took place, and the Defendants are left to guess which controlling shareholders were responsible for this alleged fraud."); *In re K-tel Intern., Inc. Sec. Litig.*, 300 F.3d 881, 893 (8th Cir.2002) ("the Class fails to provide any basis for the allegations or sources for the amounts, other than later financial disclosure made by K-tel. The Class fails to specify any contracts or circumstances that K-tel knew at the time of the March 10–Q or June 10–K would result in the specified losses. Merely stating a particular dollar amount without a corresponding source or basis is insufficient under the [PSLRA].") (citations omitted); *Chalverus v. Pegasystems, Inc.*, 59 F.Supp.2d 226, 233 (D.Mass.1999) ("a securities fraud plaintiff adequately pleads financial fraud based on improper revenue recognition by alleging some *particular* transaction in which revenues were improperly recorded, the name of the customer, the terms of the specific transaction, when the transaction occurred, and the approximate amount of the fraudulent transaction") (emphasis added); *Cathedral Trading, LLC v. Chicago Bd. Options Exchange*, 199 F.Supp.2d 851, 857 (N.D.Ill. 2002) ("Despite the wealth of detail about options trading in this 44–page complaint, the actual fraud allegations are vague, generic, and nonspecific. The plaintiffs fail to identify any specific transactions constituting the fraud, the 'what' about which they complain. Fraud cases have been dismissed for failure to satisfy the specificity requirements when the plaintiff failed to provide 'a single concrete example' of a particular fraudulent activity.").

In this case, the Shareholders have alleged only incomplete, "[a]necdotal evidence of particular problems," and these allegations do not "create a strong inference that [Keithley's] general, global statements about the progress of [the company's] plans were knowing or reckless misrepresentations." *In re Federal–Mogul Corp. Sec. Litig.*, 166 F.Supp.2d 559, 564 (E.D.Mich.2001). As such, the Shareholders' allegations showing a supposed material divergence between Keithley's "known operational problems" and Keithley's publicly stated expectations do not satisfy the PSLRA scienter pleading requirement.

### b. Motive and Opportunity.

■ Allegations of motive and opportunity "may, on occasion, rise to the level of creating a strong inference of reckless or knowing conduct." *In re Comshare*, 183 F.3d at 551. But a plaintiff cannot "establish a 'strong inference' of scienter merely by alleging facts demonstrating motive and opportunity where those facts do not simultaneously establish that the defendant

acted recklessly or knowingly, or with the requisite state of mind." *Id.* In other words, even if a plaintiff offers allegations showing "a defendant's motive and opportunity to commit fraud," he has not satisfied PSLRA pleading requirements; the plaintiff must *also* plead facts "simultaneously establish[ing] that the defendant acted recklessly or knowingly" *Id.*

Arguably, given the Court's conclusion that the Shareholders' other allegations are so incomplete that they do not show with sufficient particularity that Keithley acted recklessly or knowingly, an analysis of the allegations going to motive and opportunity is unnecessary. For the sake of examining the "totality of the circumstances," however, the Court examines this other aspect of the scienter pleading requirement, especially because the Shareholders assert that the overarching reason behind the alleged misrepresentations was to allow Mr. Keithley and other insiders to profit by selling "millions of dollars worth of their own Keithley stock at artificially inflated prices." Complaint at ¶ 58.

Here, the sole evidence of motive and opportunity identified by the Shareholders is stock trades made by insiders shortly before Keithley's stock price declined by 28% on March 12, 2001. As an initial matter, it is notable that the Shareholders do not allege facts similar, in scope or degree, to those in *In re Telxon Sec. Litig.*, 133 F.Supp.2d 1010, 1032 (N.D.Ohio 2000), a securities fraud case cited by the Shareholders over which the undersigned presided and in which scienter *was* adequately alleged. In *Telxon*, the defendants were new executives under pressure to "improve performance after several initial quarters of poor performance under their oversight." *Id.* at 1028. The *Telxon* executives were, moreover, "motivated by the promise of substantial additional compensation to make sure their predictions of profitable performance became a reality"

and by "the need to stave off … take over efforts and an ensuing proxy battle." *Id.* The Shareholders' do not allege similar circumstances. Mr. Keithley was no neophyte anxious to prove his mettle, he is the son of the founder of the company and has been CEO for over a decade. And no take-over efforts, proxy battles, or particular compensation methods are alleged which would give rise to some particular danger to Mr. Keithley's position or to the company generally. In *Telxon*, the allegations that the defendants had a motive and opportunity to commit fraud were detailed and weighty. In contrast, rather than alleging a "constellation" of facts probative of motive and opportunity to commit securities fraud, the Shareholders point only to a small amount of insider sales, which, as explained below, is ultimately not probative. Indeed, comparing this case to various others where allegations of motive and opportunity have been considered meaningful is instructive. *See, e.g., Stevelman v. Alias Research Inc.*, 174 F.3d 79 (2nd Cir.1999) (CEO sold 40% of his stock holdings during a period when the company disregarded generally accepted accounting practices and SEC regulations); *In re Health Management Inc. Sec. Litig.*, 970 F.Supp. 192, 198 (E.D.N.Y.1997) (the defendant company included "severely delinquent, uncollectible and, in some cases, fictitious accounts receivables" on its financial statements, and there was evidence that the individual defendants, who were large shareholders, knew of and arranged for the mis-accounting to prop up the stock price).

By contrast, the evidence of motive proffered here—the mere fact of profitable insider sales—pales. First, it is not clear that the Court should even consider those other insiders who are not named as defendants. *Cf. In re PetSmart, Inc. Sec. Litig.*, 61 F.Supp.2d 982, 1001 (D.Ariz. 1999) ("[w]ithout specific facts suggesting that defendants intended their manipu-

lation of [the company] stock to assist these specific colleagues, we find no reason to consider these transactions"); *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, (1st Cir.1996) (examining the stock sales of two non-defendant insiders, who sold 20% and 68% of their holdings during the relevant period). Even adopting the view, however, that the Court should look at the stock sales of both Mr. Keithley *and* other non-defendant "insiders," to the extent those non-defendants can truly be characterized as knowledgeable—which this Court is inclined to believe is the most appropriate view—"courts have repeatedly held that the mere existence of stock sales does not raise a strong inference of fraudulent intent. Plaintiffs have the burden at the pleading stage of explaining *why* the stock sales were unusual or suspicious." *PetSmart*, 61 F.Supp.2d at 1000 (citation omitted, emphasis added).

To carry this burden, the plaintiff must show that the stock trades were "in amounts dramatically out of line with prior trading practices, at times calculated to maximize personal benefit from undisclosed inside information." *Id.* (citations omitted). A complaint that merely provides "the names of the insiders who sold stock, the quantities of stock sold and the prices at which the sales occurred, and the dates of the sales" is insufficient, because it does not reveal critical contextual data. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1423 (3rd Cir.1997). Specifically, these figures have little meaning without knowing each insider's "total stock holdings," whether the "trades were normal and routine" or unusual, and "whether the profits made were substantial enough in relation to the [insider's] compensation levels ... to produce a suspicion [of] ... an incentive to commit fraud." *Id.*

In this case, although the complaint alleges the existence of stock sales by insiders, the allegations do not reveal whether: (1) these insiders sold anything more than a small fraction of their total holdings; (2) their trades were outside of their ordinary routine; nor (3) how their profits related to their total compensation. Without these allegations, the inference of mendacious scienter is weak, at best. Furthermore, in his motion to dismiss, Mr. Keithley provides public records showing that his stock sales during the relevant period were, in fact, a *small fraction* of his total holdings and *consistent* with his own stock sale history.[10] The 54,530 shares sold by Mr. Keithley during the class period, upon which the Shareholders ground their assertion that Mr. Keithley engaged in an illegal insider trading scheme, were less than 2½ % of his total holdings of 2,204,202 shares.[11] In the 12 months immediately

10. This Court may take judicial notice of this critical information. *See Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360–61 (6th Cir.2001) ("this Court may consider the full text of the SEC filings, prospectus, analysts' reports and statements 'integral to the complaint,' even if not attached, without converting the motion into one for summary judgment") (citation omitted); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276 (11th Cir. 1999) (approving the "practice of judicially noticing relevant documents legally required by and publicly filed with the SEC at the motion to dismiss stage"); *In re Royal Appliance Sec. Litig.*, 64 F.3d 663, 1995 WL 490131 at *2 (6th Cir.1995) (a district court "may consider the full texts of the SEC filings, prospectus, analyst's reports and statements 'integral to the complaint,' even if not attached, without converting the motion [to dismiss a securities fraud claim] into one for summary judgment under Rule 56").

11. Both the 54,530 figure and the 2,204,202 figure include not only Mr. Keithley's personal stock holdings but those he controlled as majority partner of a family partnership. Mr. Keithley asserts that the 41,500 Class A shares he sold on January 22, 2001 were available to him in the form of non-renewable stock options, which were scheduled to expire on February 7, 2002, so that if he had not sold the shares by February 7, 2001, "they would have

preceding the class period, Mr. Keithley sold an average of over 220,000 shares *each month*, including over 767,000 shares in June of 2000, with at least some stock sales in 10 of those 12 months.[12] In context, then, the Shareholders' allegations of stock transactions by Mr. Keithley tend to *negate* the inference the Shareholders seek to draw. *See Stavroff v. Meyo*, 987 F.Supp. 987, 1000 (N.D.Ohio 1995), *affirmed*, 129 F.3d 1265 (6th Cir.1997) (table) ("any inference of insider trading is negated by [the defendant's] trading [of Telxon stock] 'consistent in timing and amount with a past pattern of sales' ") (quoting *Freeman v. Decio*, 584 F.2d 186, 197 (7th Cir.1978)). The relevant data simply does not support the inference that Mr. Keithley attempted to profit illegally using the scheme alleged by the Shareholders.[13]

The Court cannot "infer fraudulent intent from the mere fact that some officers sold stock" during the class period. *Burlington*, 114 F.3d at 1423.[14] Here, the Shareholders fail to provide critical allegations that put the insider sales in context, and publicly available documents show that, if anything, the context suggests *lack* of motive and opportunity. Accordingly, examining the totality of the circumstances and all of the Shareholders' allegations, the Court concludes the Shareholders do not meet the PSLRA's pleading requirements. For this reason alone, the motion to dismiss the Shareholders' claims under § 10(a) and Rule 10b–5 is well-taken.

### 2.  Forward–Looking Statements.

 In addition to arguing that the amended complaint does not allege the details of the claimed securities fraud, and especially the scienter element, with sufficient particularity, Keithley also argues that the statements about which the

---

been rendered worthless." Motion at 20. While the imminent expiration of the option period explains why Mr. Keithley had to exercise the option and *buy* the shares by that date, it does not necessarily explain why Mr. Keithley had to *sell* them by that date; presumably, he could have simply retained the stock in his portfolio. Regardless, it is clear that these stock holdings were a small fraction of his total.

**12.** Again, these figures include both Mr. Keithley's personal stock holdings and those he controlled through a family partnership.

**13.** It is worth noting here that Keithley's comparative analysis of the price of Keithley stock during the class period, recited in section III.A above, also weakens the inference of scienter, and suggests the Shareholders do not sufficiently connect, via proximate cause, the alleged misrepresentations with their losses.

**14.** At oral argument, counsel for the Shareholders tried to bolster their claim that the Court should draw such an inference by citing to a study suggesting that "insiders possess and trade upon knowledge of specific and economically significant forthcoming ac-

counting disclosures as long as *two years* prior to the disclosure." Hearing tr. at 50. Even if the Shareholders had alleged facts or provided data showing that Mr. Keithley and other insiders sold unusually large amounts of stock during this two-year period—which they did not—the Court still cannot infer fraudulent intent merely because the sales took place. This is especially so where, as here, the Shareholders do not allege conduct (such as improper accounting methodology) predating the disclosure by a period which coincides with, or even closely approximates, that trading history. Thus, while a study like the one cited by the Shareholders might be informative to a scienter analysis in a case, like *Telxon* or others prominently in the news of late, that is primarily premised on allegations of improper accounting manipulations that artificially inflated a company's balance sheet over a definable time, that is not the case presented by the Shareholders' allegations. The Shareholders concede that, prior to the fairly narrow time frame defined by their complaint, Keithley had legitimately declared record sales, earnings, and profits, and was otherwise a company whose focus was to "ensure quality." In such circumstances, no negative inferences can fairly be drawn from any sales history.

Shareholders complain are protected by the PSLRA's "safe harbor." This argument, which provides an independent and sufficient ground for dismissal, is also well-taken.

■ The PSLRA's safe harbor protects individuals from claims of liability based on "forward-looking statements." A "forward-looking statement" includes: (a) statements containing projections of revenues, income, earnings per share, or other financial items, (b) statements of the plans and objectives of management for future operations, (c) statements of future economic performance, and (d) any statement of the assumptions underlying or relating to any of the above. 15 U.S.C. § 78u–5(i)(1). The statutory safe harbor insulates a defendant from private securities liability for forward-looking statements if the forward-looking statement is identified as such and "is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements." 15 U.S.C. § 78u–5(c)(1)(A)(i). Even if the forward-looking statements are not accompanied by meaningful cautionary statements, a defendant is still insulated from liability if the plaintiff cannot show that the forward-looking statements were made by or with the approval of an executive officer of the company who had "actual knowledge" that they were false or misleading. 15 U.S.C. § 78u–5(c)(1)(B); *see In re Telxon Corp. Sec. Litig.*, 133 F.Supp.2d 1010, 1032 (N.D.Ohio 2000) (discussion by the undersigned of the PSLRA "safe harbor" for forward-looking statements). The statutory safe harbor, however, "does *not* insulate defendants from private securities liability based on statements that misrepresent historical/hard current facts." *Gross v. Medaphis*, 977 F.Supp. 1463 (N.D.Ga.1997) (emphasis added); *In re Sunbeam Securities Litigation*, 89 F.Supp.2d 1326, 1339 (S.D.Fla.1999).

In this case, there is no question that the language contained in the Keithley press releases and Form 10–Q to which the Shareholders object were "identified as forward-looking statement[s]" and were "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." Every one of the press release sentences alleged in the complaint to be a misrepresentation were described in the press releases themselves as "forward-looking statements that involve a number of risks and uncertainties." First Press Release at 2; Second Press Release at 2. The press releases went on to warn that actual results could differ "materially" from expected results due to, among other factors, "general economic and business conditions in the semiconductor, telecommunications, optoelectronics and other industries including the cyclical nature of these industries." The press releases also referred the reader to warnings contained in the company's Form 10–Q, which included the following:

> Although the company operates in a single industry segment, certain of its products and product lines are targeted for specific industries including the semiconductor, telecommunications, optoelectronic, and other electronic industries. These industries, particularly the semiconductor industry, can be cyclical in nature. * * * Historically, sales and order levels for this business have been volatile which can effect revenue and earnings for the company.

Form 10–Q at 11.

Notably, the Shareholders do *not* contend that any of the statements made by Keithley regarding the company's *past* performance—for example, the fact that Keithley had achieved "record sales, earnings, orders, and backlog," representing

"the eighth consecutive quarter of record pretax earnings"—were false. First Press Release at 1.[15] Nor do the Shareholders assert that Keithley's statements that it was then enjoying a "record backlog" were false when made.[16] Rather, the Shareholders insist only that Keithley was at least reckless in stating its expectations of continued, future record growth when it had reason to know that certain aspects of its business were not operating as efficiently as they had in the past. But Keithley's cautionary language warned explicitly that its expected sales and earnings were susceptible to "cyclical" and "volatile" customer demand. And, despite the Shareholders' vague allegations of other problems, it was precisely this volatility to which Keithley points as the reason for its declining prospects. When Keithley issued its March 12, 2001 press release, it explained that its expectations had been dashed due to a "sudden slowing" of the general economy and its customers' sectors in particular; this "rapidly changing environment" lead Keithley to a "revised outlook ... driven by the restraint of our customer's spending and is not the result of a change in our competitive position." Third Press Release at 1. In other words, the volatility of customer demand, about which Keithley had warned in its two earlier press releases, had come to pass.[17]

"[W]hen an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Helwig*, 251 F.3d at 558 (quoting *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999)). Here, the press releases included warnings directed at precisely the type of business peril that occurred. Whatever one's view of the wisdom behind including a "safe harbor" in the PSLRA, the Court has no doubt that this safe harbor was

---

**15.** *See* Hearing tr. at 55 (identifying the statements believed to be false). This fact, alone, completely distinguishes this case from *Telxon*.

**16.** Even if the Shareholders did allege that the "record backlog" statements were false, it remains likely that the statements would still be considered "forward-looking." *See Weiss v. Mentor Graphics Corp.*, 1999 WL 985141 at *11 (D.Or. Oct. 6, 1999) ("The representation that a strong backlog was one reason for meeting those financial projections is a 'statement of the assumptions underlying or relating to' the financial projections. As a result, referring to strong backlog as a predictor of future performance is a forward-looking statement.").

**17.** Moreover, the Shareholders object to Keithley's statements about projected growth in sales, earnings, and orders, and their customer's continued goodwill, but these statements appear to be mere "puffery." *See Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F.Supp. 1101, 1122 (W.D.Mich.1996) ("where the allegedly false statements are worded as vaguely optimistic predictions, ·they are not material as a matter of law. Such statements are considered 'mere puffery' upon which no reasonable investor would rely. Statements which are generally not considered mere puffery include predictions *worded as guarantees* or predictions supported by specific factual assertions. Combining puffery with accurate historical statements does not render puffery material.") (citations and footnote omitted; emphasis added); *Cione v. Gorr*, 843 F.Supp. 1199, 1205 (N.D.Ohio 1994) (the coupling of defendants' truthful statements of past facts with generic expression of optimism about the company's future performance does not raise these statements to the level of materiality. 'We expect our growth in sales and profitability to continue,' '[we] anticipate continued strong demand for [our] products,' 'opportunities should expand,' 'we're well positioned for long-term growth,' and '[the company] is now looking forward to the opportunities which will be provided by a steadily improving national economy' hardly contain the type of event-specific information and guarantees necessary to make prognostications of future success material).

designed to protect companies and their officers from liability for the very type of statements that Keithley made in their press releases and Form 10–Q.

The only misrepresentations identified by the Shareholders other than those in the press releases and Form 10–Q are the statements made by stock analysts. But these statements are clearly couched as the analysts' own opinions, with language like "we expect" and "in our opinion" and "we are assuming" and "our recommendation." Complaint at ¶¶ 46, 55. Furthermore, except for the most conclusory of statements, the Shareholders do not allege that Keithley and the analysts were "entangled," and there is a dearth of detail regarding which defendants spoke to which analysts, what misstatements were made, how those misstatements were false or misleading, and how they reached the market. *See In re Crown American Realty Trust Sec. Litig.*, 1997 WL 599299 at *18 n. 2 (W.D.Pa. Sept. 15, 1997) (discussing the high pleading requirements when the plaintiff sues under the theory that "a corporate officer or employee makes false and misleading statements to an analyst, who then in good faith incorporates them into his or her report"); *Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F.Supp. 1101, 1126 (W.D.Mich.1996) ("statements made originally by independent market analysts are not actionable unless a plaintiff can plead with particularity who among defendants supplied the information, how it was supplied, and how defendants could have controlled the content of the statement").

In sum, the alleged misrepresentations by Keithley are either protected by the PSLRA's safe harbor for forward-looking statements, or are not attributable to Keithley at all. Accordingly, Keithley's motion to dismiss the Shareholders' claims under § 10(a) and Rule 10b–5 is well-taken.

*B.   Section 20(a).*

In addition to their claims under § 10(b) and Rule 10b–5, the Shareholders also assert Mr. Keithley is vicariously liable under § 20(a) of the Act. Section 20(a) imposes joint and several liability on any "person who, directly or indirectly, controls any person liable" for securities fraud under the Act, "unless the controlling person acted in good faith and did not directly or indirectly induce" the violations. 15 U.S.C. § 78t(a).

■ "In order to prove a prima facie case under section 20(a), a plaintiff must prove a primary violation of federal securities laws and that the targeted defendants (here, [Mr.Keithley]) exercised actual power or control over the primary violator." *In re SCB Computer Technology, Inc. Sec. Litig.*, 149 F.Supp.2d 334, 356 (W.D.Tenn.2001) (citing *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000), and *Ganino v. Citizens Utils., Co.*, 228 F.3d 154, 170 (2nd Cir.2000)). Given that the Shareholders fail to state a cause of action against Keithley or Mr. Keithley under Rule 10b–5, "there is no primary violation on which a section 20(a) claim can be premised." *Id.* Therefore, Mr. Keithley's motion to dismiss the complaint for failure to state a claim under section 20(a) must also be granted. Accordingly, the complaint is dismissed in its entirety.

**IT IS SO ORDERED.**